870 A.2d 875

**William COLPETZER**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (STANDARD STEEL),**

**Appeal of Standard Steel.**

**David Zerby**

**v.**

**Workers' Compensation Appeal Board (Reading Anthracite Company),**

**Appeal of Reading Anthracite Company.**

Supreme Court of Pennsylvania.

Argued Dec. 2, 2003.

Decided March 30, 2005.

Richard B. Tucker, Pittsburgh, Dennis Richard Sheaffer, for Standard Steel, appellant.

Katherine M. Lenahan, Scranton, for Reading Anthracite Co., appellant.

Andrew Edison Greenberg, Norristown, for Pa. Defense Inst., appellant amicus curiae.

Amber Marie Kenger, Mechanicsburg, Richard C. Lengler, Harrisburg, for W.C.A.B., appellee.

Daniel King Bricmont, Pittsburgh, for William Colpetzer, appellee.

Jeffrey Charles Majikas, for David Zerby, appellee.

Thomas Patrick Brown, Carlisle, for PA Trial Lawyers Ass'n, appellee amicus curiae.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice CASTILLE.

In *Hannaberry HVAC v. Workers' Compensation Appeal Bd. (Snyder, Jr.),* 575 Pa.66, 834 A.2d 524 (2003), this Court recently considered whether, under Section 309(d) of the Workers' Compensation Act, *see* 77 P.S. § 582(d), the General Assembly intended that a seriously and permanently injured full-time worker, whose three months of full-time employment was immediately preceded by part-time after-school employment, should be penalized by having the periods of his part-time scholastic employment included in the calculation of his average weekly wage ("AWW"). The *Hannaberry* Court concluded that this Section of the Act was intended to ensure an accurate calculation of an injured worker's average wages, and thus, we held that the diminished wages reflected by earnings in earlier periods when the claimant was a part-time student worker could not be included to dilute the appropriate benefit amount.

In these consolidated appeals, this Court is faced with a different but related interpretive question under Section 309(d): *i.e.,* whether the General Assembly intended that a

worker who receives workers' compensation benefits resulting from a workplace injury, and who then returns to work and sustains a new injury, should be penalized by including in the computation of his AWW periods when he earned no wages because of the initial work injury. In each appeal, the Workers' Compensation Appeal Board ("WCAB") construed the Act to require that the periods of time when the Claimants earned no actual wages due to the initial work injury be included in the calculation of the AWW for the second injury, thus resulting in an AWW which underestimated the workers' true earning capacity. Also in each appeal, the Commonwealth Court, which did not have the benefit of our decision in *Hannaberry*, reversed—by panel decision in *Zerby* and by *en banc* decision in *Colpetzer*—taking an approach to the question which followed this Court's teaching in *Triangle Building Center v. Workers' Compensation Appeal Bd. (Linch)*, 560 Pa.540, 746 A.2d 1108 (2000), and in some respects foreshadowed this Court's approach in *Hannaberry*. For the reasons that follow, we hold that in these cases, as in *Hannaberry*, an accurate computation of the Claimants' AWW requires that the artificially depressed wages they received because of a prior compensated work injury cannot be included in the computation of the AWW for the second work injury. Accordingly, we affirm the Commonwealth Court in both appeals.

To understand properly the procedural history of these cases, including the reasons for the rulings below, familiarity with the Act's payment computation scheme is required. In cases of total work disability, which was at issue in both cases *sub judice*, the Act authorizes an award of "sixty-six and two thirds per centum of the wages of the injured employe as defined in Section 309 beginning after the seventh day of total disability, and payable for the duration of total disability...." 77 P.S. § 511(1). Section 309, as amended by the Act of June 24, 1995, P.L. 350 (Act 57), then sets forth a scheme of computing "wages," a term which it defines as meaning "the average weekly wages of the employe." 77 P.S. § 582. Sections 309(a), (b) and (c) provide the method of calculating AWW when the employee's wages are fixed by the week,

month or year, respectively. None of those subsections are at issue in the cases *sub judice*. Section 309(d) describes the method of calculation where, as here, wages are fixed otherwise:

(d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the average weekly wage shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

77 P.S. § 582.[1]

The facts of the individual cases are as follows:

### *Colpetzer v. Workers Compensation Appeal Bd. (Standard Steel)*

Claimant William Colpetzer suffered a cervical strain on December 5, 1996, while in the course of his employment with Standard Steel, a Division of the Freedom Forge Corporation ("Standard Steel"). Standard Steel issued a notice of compensation payable fixing claimant's AWW at $525.80, with a corresponding compensation rate of $350.53 per week. Claim-

---

1. Section 309(c) addresses AWW calculations respecting employment, and thus is not relevant here.

ant worked a restricted duty position from December 6, 1996 until February 23, 1997 and was then placed on total disability from February 24, 1997 until May 4, 1997.

On November 2, 1998, Claimant filed a modification petition contending that Standard Steel had calculated his AWW incorrectly because, for nearly half of the fifty-two weeks of his employment with Standard Steel preceding the December 5, 1996 work injury, he had been disabled by a previous work injury, for which he received workers' compensation benefits.[2] Specifically, on March 15, 1996, Claimant had suffered a right shoulder strain for which Standard Steel had issued a notice of compensation payable establishing an AWW of $791.32 and a compensation rate of $527.00 per week. Claimant argued that his "average" wages were artificially depressed in the fifty-two weeks preceding the present injury due to the fact of his March 1996 disabling injury. In Claimants view, his AWW for the December 5, 1996 injury should have been calculated by averaging only the wages he received during the two complete quarters when he was not disabled and was actually earning his normal wages. Claimant invoked Section 309(d.1) of the Act, which governs AWW calculations in situations where an employee was not employed for three consecutive thirteen-week periods in the year immediately preceding injury, and which permits a computation of AWW based upon averaging any completed periods of thirteen calendar weeks of employment.

Standard Steel responded by arguing that Section 309(d) speaks in terms of periods of "employment," not periods of "working," and that Claimant in fact remained "employed" during the entire 52–week period preceding injury, even though he was unable to work during substantial periods of that time. Thus, Claimant accrued seniority benefits, pension benefits, health insurance benefits and vacation benefits when he was out on disability and receiving workers compensation. Because Claimant was continuously "employed" during the year preceding his second injury, Standard Steel argued,

2. Petitioner also sought benefits for disfigurement, which the WCJ granted. This determination is not at issue in the present appeal.

Section 309(d.1) did not apply. Instead, the calculation of AWW was governed by Section 309(d), which requires averaging wages earned during the three highest of the four immediately prior thirteen-week periods of employment—even if those periods included weeks where no wages were actually earned because the claimant was totally disabled by a previous work injury.

The assigned Workers' Compensation Judge ("WCJ") agreed with Standard Steel that Claimant's actual average work earnings during the three highest of the previous four thirteen-week periods preceding his December 5, 1996 work injury controlled the determination of the AWW, irrespective of his status during large portions of those periods as a disabled worker receiving compensation benefits in lieu of wages. The WCAB affirmed, employing reasoning similar to that of the WCJ.

Upon further appeal by Claimant, a panel of the Commonwealth Court reversed in a published decision by the Honorable Charles P. Mirarchi, Jr. *Colpetzer v. Workers Compensation Appeal Bd. (Standard Steel),* 802 A.2d 1233 (Pa.Cmwlth. 2002). The panel first agreed with the tribunals below that, in determining whether Section 309(d) or subsection 309(d.1) applied, it was the fact of claimant's employment, and not whether he actually "worked" during those periods, which controlled. Therefore, Section 309(d) applied. However, the panel did not end its analysis there. Citing this Court's decision in *Triangle Building Center,* 560 Pa. 540, 746 A.2d 1108, the panel reasoned that the aim of Section 309 is to establish a baseline figure for calculating the AWW which *"reasonably reflects* the *reality* of the claimant's pre-injury earning experience as a predictor of *future earning potential."* 802 A.2d at 1236 (emphasis original). In the case *sub judice,* the panel noted, Claimant's earnings in the four thirteen-week periods preceding his latest injury were as follows:

| | From | To | Wages |
|------------|---------|---------|------------|
| 1st Period | 12-4-95 | 3-3-96 | $7,407.15 |
| 2d Period | 3-4-96 | 6-2-96 | $2,049.64 |
| 3d Period | 6-3-96 | 9-1-96 | $2,246.26 |

4th Period 9-2-96 12-1-96 $8,246.63

Claimant received disability payments for his initial work-related injury from March 18, 1996 until August 15, 1996—*i.e.*, for five of the six months encompassed by the second and third work quarters. Thus, the fact of that injury had severely and artificially depressed Claimant's actual earnings history and capacity. In such a circumstance, the panel reasoned:

> [T]he only way Claimant's pre-injury earning experience during this particular fifty-two week period could serve as a predictor of future earning potential would be to assume that Claimant would be off work and receiving disability benefits for approximately five months for every future fifty-two week period. This circumstance, would not, of course, reasonably reflect the reality of Claimant's actual earning experience.

802 A.2d at 1237.

The panel recognized that Section 309(d) does not specifically address the circumstance where an employee was unable to work during the relevant period only because of a previous work injury, and thus did not show wages reflecting the reality of his earning history and capacity in that job. However, the panel noted, in such a circumstance it is not difficult "to determine the reality of the employee's earning potential during the period of disability. By virtue of the fact that the employee [was] receiving disability benefits, his or her *average weekly wage* during the period has already been established." *Id.* (emphasis original). Moreover, the panel reasoned:

> Using an already established average weekly wage for periods where the employee is off on disability is certainly more reflective of the reality of the employee's earnings situation than is basing the calculation on a hole in the employee's work history established only by an absence of wages paid on the employer's ledger. The former approach more closely reflects the reality that Section 309 is designed to identify; the latter reflects an artificial situation that does nothing but present the employer with a windfall that the Act certainly did not intend. Moreover, the latter approach directly penalizes an employee for being off work

on a work-related disability and collecting benefits under the Act.

*Id.*

Standard Steel filed an allocatur petition, which this Court granted to examine the proper calculation of the AWW in a circumstance such as this.

### *Zerby v. Workers Compensation Appeal Bd. (Reading Anthracite Co.)*

On May 23, 1996, Claimant David Zerby suffered a work-related injury to his lower back and received benefits pursuant to a notice of compensation payable which established an AWW of $696.22. On August 22, 1996, Claimant's employer Reading Anthracite Company ("Reading Anthracite") filed a suspension petition alleging that Claimant had refused suitable work. On November 7, 1996, before the WCJ decided the suspension petition, Claimant returned to work. On July 6, 1997, Claimant filed a new claim petition alleging that he had sustained new work-related injuries to his back on May 29, 1997.

After consolidating the suspension and new claim petitions, the WCJ granted both. With respect to the new claim, the WCJ deemed the calculation of the AWW to be governed by subsection 309(d.1) rather than Section 309(d). The WCJ reasoned as follows: "This Judge feels the clear intent of the legislature ... was to ensure that the average weekly wage is an accurate or true reflection of Claimant's earnings, rather than being artificially inflated or deflated by unusual circumstances." WCJ Report, 3/29/99, ¶ 35. The WCJ further reasoned that acknowledging a claimant's previous worker compensation status "is in line with the humanitarian objectives of this Act," since "Claimant's wages are not overinflated by the inclusion of disability benefits which essentially attempt to put claimant in as good a position as if he were fully employed and receiving the pre-injury wages." *Id.*

Reading Anthracite appealed, arguing that the WCJ should have applied Section 309(d) of the Act rather than subsection 309(d.1). The WCAB agreed with the WCJ, holding that

because Claimant had not "actually worked" for three consecutive thirteen week periods, subsection 309(d.1) applied. In the WCAB's view, to be deemed an "employee" one had to actually "work," and not merely appear on the payroll. WCAB Opinion, 7/25/00, at 3–4. The WCAB then remanded the matter to the WCJ on an unrelated ground, involving a discrepancy in the AWW determined by the WCJ and the disability rate, a discrepancy not relevant to the present appeal.

On remand, the WCJ recalculated the compensation benefit and Reading Anthracite appealed again, again arguing that the WCJ erred in failing to apply Section 309(d) of the Act in calculating the AWW. This time the WCAB—without any discussion of its previous decision—reversed its prior position and agreed with Reading Anthracite that Section 309(d) applied because Claimant had remained "employed" during his previous disability "even though he was not working due to a different work-related disability for periods during that time." WCAB Opinion, 3/18/02, at 4.[3] The WCAB therefore concluded that the WCJ had erred in excluding from the calculation of Claimant's AWW the periods of time when Claimant had no wages because he was on a work-related disability. The WCAB accordingly modified the compensation benefit downward, and as modified, affirmed the WCJ's award.[4]

Claimant appealed and the Commonwealth Court initially affirmed in a memorandum opinion which held that, because Claimant technically remained "employed" during the periods of his work disability, Reading Anthracite correctly calculated his AWW as including those periods when he was out on disability and had received no wages. Claimant sought reconsideration and the Commonwealth Court granted review *en*

3. We note that there is no issue raised before this Court concerning the WCAB's change of view concerning this controlling legal issue.

4. The effect of the previous work injury upon the calculation of AWW was no less stark in this case than in *Colpetzer*. During the two quarterly periods where Claimant was working, he had an AWW of $631.93 and $634.28, respectively. The two quarters directly affected by his previous work injury, however, revealed an AWW of $16.46 and $197.13, respectively.

*banc* to consider the apparent inconsistency between *Colpetzer, supra,* and *Merkle v. Workers' Compensation Appeal Bd. (Hofmann Industries),* 796 A.2d 1034 (Pa.Cmwlth.2002), upon which the panel had relied in rejecting Claimant's appeal.

The *en banc* panel ultimately reversed the WCAB with respect to the proper calculation of Claimant's AWW in a 5–2 published decision. *Zerby v. Workers' Compensation Appeal Bd. (Reading Anthracite Co.),* 821 A.2d 193 (Pa.Cmwlth.2003) (*en banc*). The majority reaffirmed the panel's position that Section 309(d) applied, rather than subsection 309(d.1) as Claimant had argued, because the statute speaks in terms of an "employment" relationship and not "work." The majority then determined that *Colpetzer* and *Merkle* were technically distinguishable because the specific legal question in *Merkle* was confined to whether the claimant was "employed" while receiving disability benefits. Nevertheless, the majority recognized that the effect of the *Merkle* decision, as reflected in the panel decision in the case *sub judice,* was to impose a non-statutorily-based penalty on a claimant for the misfortune of sustaining another work injury within a year of returning to the workforce from a previous work injury. The majority further acknowledged that the precedential rule which had been derived from *Merkle*—that the actual wages a claimant earned during the relevant time periods were the only measure of AWW for a current disability, even if that measure would penalize a worker for a prior work injury—conflicts with the precedential rule that had been established in *Colpetzer.* The majority then determined that the *Colpetzer* panel's method of calculating the AWW in this instance is the correct method. 821 A.2d at 197–99.

The majority went on to note an additional, and in its view stronger, legal basis in favor of the *Colpetzer* method of calculation in the "less typical" situation (posed in *Zerby*; *Colpetzer* and *Merkle*) where there has **already been** a prior determination from within the workers' compensation system as to the claimant's AWW. The majority noted that Section 423 of the Act states that a notice of compensation payable

cannot be modified unless it was materially incorrect.[5] In the majority's view, applying Section 309(d) in a way that would require a "recalculation" of an AWW already established in a notice of compensation payable, without an allegation that the original AWW was incorrect, would present a conflict with Section 423. That conflict could be avoided, the majority noted, so long as the calculation provided for in Section 309(d) was not interpreted so as to permit **recalculations.** Accordingly, the panel held that:

> [I]n cases where Section 309(d) applies, use of the previously established AWW is required by Section 423 and is more reflective of the reality of employee's earnings. Furthermore, this statutory interpretation does not inadvertently punish claimants who suffer another injury after returning from a previous disabling work-related injury. To the extent *Merkle* conflicts with our holding today, it is overruled.

821 A.2d at 200. The court then remanded the matter for a recalculation of AWW and Claimant's compensation benefit in light of the discussion in the opinion.[6] Reading Anthracite filed an allocatur petition, which this Court granted, and the appeal was consolidated with the *Colpetzer* appeal.

 This Court's standard of review in workers' compensation appeals is settled: we will affirm the adjudication below unless we find that an error of law was committed, that constitutional rights were violated, that a practice or procedure of a Commonwealth agency was not followed or that any necessary finding of fact is not supported by substantial evidence of record. 2 Pa.C.S. § 704; *Hannaberry*, 834 A.2d

---

5. Section 423 of the Act, 77 P.S. § 771, provides:

> A workers' compensation judge may, at any time, review and modify or set aside a notice of compensation payable and an original or supplemental agreement or upon petition filed by either party with the department, or in the course of the proceedings under any petition pending before such workers' compensation judge, if it be proved that such notice of compensation payable or agreement was in any material respect incorrect.

6. Judge Friedman filed a dissenting opinion joined by Judge McGinley. The dissent would have concluded that subsection 309(d.1) applied in this instance and would have calculated the benefit accordingly.

at 527; *Mitchell v. Workers' Compensation Appeal Bd.
(Steve's Prince of Steaks)*, 572 Pa.380, 815 A.2d 620, 623–24
(2003). Here, the pertinent facts in the two cases are undis-
puted and no party has alleged a constitutional violation or
that an agency practice or procedure was not followed. The
sole issue involves the proper manner of calculating the AWW
in an instance where a claimant received reduced or no wages
during a pertinent period solely because he was out on disabil-
ity for a previous work injury. Since this is a question of law,
our review is plenary. *Hannaberry, supra* (collecting cases).
In approaching the question, we note that " '[o]ur basic prem-
ise in workmen's compensation matters is that the Workmen's
Compensation Act is remedial in nature and is intended to
benefit the worker, and, therefore, the Act must be liberally
construed to effectuate its humanitarian objectives.' " *Han-
naberry*, 834 A.2d at 528, *quoting Peterson v. Workmen's
Compensation Appeal Bd. (PRN Nursing Agency)*, 528
Pa.279, 597 A.2d 1116, 1120 (1991) (collecting cases). Accord-
ingly, "[b]orderline interpretations of the [Workers' Compen-
sation] Act are to be construed in the injured party's favor."
*Hannaberry, supra, quoting Harper & Collins v. Workmen's
Compensation Appeal Bd. (Brown)*, 543 Pa.484, 672 A.2d 1319,
1321 (1996) (citation omitted).

Predictably enough, the arguments in these appeals echo
the positions taken by the claimant and the employer in
*Hannaberry*. Employers [7] contend that Section 309(d) is clear
and unambiguous and provides that a claimant's AWW should
be calculated using his actual wages earned during the rele-
vant period. Employers argue that nothing in Section 309(d)
suggests that amounts not received by a claimant as wages are
to be imputed into the calculation of the AWW. Employers
further argue that the AWW must reflect wages for work
actually done or services actually rendered, and not estimates
of what might have been received for work not actually done
or for services not actually rendered.

**7.** Although Standard Steel and Reading Anthracite do not make entirely
identical and overlapping arguments, we have combined their points
for ease of exposition. We do the same for Claimants' arguments.

With respect to the Commonwealth Court's opinion in *Zerby* and its reliance upon Section 423 of the Act, Employers contend that refraining from crediting a claimant with the amount of the AWW established for a prior work-related injury does not amount to a recalculation of that prior AWW. Rather, Employers insist that their approach simply recognizes that the prior AWW has no place in the statutory formula used to calculate the AWW for the current work-related injury. In Employers' view, Section 423 sets forth a procedure for correcting initial computational errors whereas Section 309 addresses the method of computing an injured employee's benefits for discrete work injuries.

Employers further argue that the Commonwealth Court's reliance upon this Court's opinion in *Triangle Building Center, supra,* is misplaced. Employers note that, while it is true that the *Triangle Building Center* Court held that an AWW computation should "create a reasonable picture of a claimant's pre-injury earning experience for use as a projection of potential future wages and, correspondingly, earnings loss," a benefit calculation that truly reflects a claimant's economic reality must include the fact of a total lack of earning capacity due to a prior work injury.

Finally, Employers maintain that the Commonwealth Court's statutory analysis amounted to a prohibited judicial re-writing of Section 309(d) to require inclusion of an imputed wage, not actual wages earned, into the calculation of the AWW. Employers submit that the purpose of the 1996 amendments to the Act was to reduce benefits, not expand them, and thereby to curtail businesses from leaving Pennsylvania in favor of other states with more favorable workers' compensation laws. To the extent that a literal application of the amendments is perceived as unfair or inequitable, Employers assert, that is a matter best left to the General Assembly to correct.

Claimants' responsive arguments largely track the respective reasoning in the Commonwealth Court panel opinions, which we have already summarized above. With respect to issues of statutory construction, Claimants submit that Section

309(d) is ambiguous, at least in situations such as those *sub judice*. Claimants argue that decisions from both this Court and the Commonwealth Court have uniformly recognized that construction of the statute is required to avoid the absurd results that would accompany a literal application of the Act to such unusual work situations. Such an absurd result would arise here if Claimants were to have their true earning capacities severely and artificially diminished merely because they were victims of previous work calamities. Claimants argue that the Commonwealth Court's interpretation of the provision both promotes an accurate assessment of a claimant's pre-injury earning capacity and is consistent with the recognized remedial purpose of the Act. In support of this argument, Claimants echo the Commonwealth Court's reliance upon the teachings in the *Triangle Building Center* case.

Claimant Zerby argues that the proper way to calculate AWW for the second work injury is to include the previously established AWW for the first work injury in the calculation of wages for those relevant periods where no wages were earned. Claimant Colpetzer, on the other hand, argues that either this approach or reliance upon subsection 309(d.1) would be consistent with the legislative intention of ensuring a fair and accurate estimate of the AWW. Colpetzer also argues that Employers' construction would award employers and their insurers a "windfall" based upon "fortuitous circumstances" having nothing to do with the accurate assessment of a worker's true "average" wages. Colpetzer also notes that each of the constructions it advocates is consistent with the General Assembly's intention, in amending Section 309(d), to provide for a calculation of the AWW which does not permit a claimant to rely upon periods of spiked or atypically high wages.

The two most relevant cases to our determination are this Courts decisions in *Triangle Building Center,* which both Commonwealth Court panels sought to follow, and *Hannaberry,* which was decided after the instant cases were resolved below. In *Triangle Building Center,* the claimant was injured while working on one job, but at a time when he was employed

in and temporarily laid off from a second and concurrent job, for which he was receiving unemployment compensation benefits. Subsection 309(e) of the Act addresses concurrent employment scenarios, providing that where an employee is working under concurrent contracts with multiple employers, his wages from all employers "shall be considered as if earned from the employer liable for compensation." 77 P.S. 582(e). The issue before this Court was whether the temporary layoff precluded "assessment of [the claimant's] concurrent earnings experience within the average weekly wage calculation." 746 A.2d at 1109. We held that it did not.

In so holding, this Court began by noting that "[t]he Act seeks to compensate claimants for the ongoing loss in earning capacity resulting from their injuries; therefore, some reasonable assessment must be made of claimants' pre-injury ability to generate future earnings." *Id.* at 1112. After discussing how Section 309 would operate in certain common work scenarios, we noted that "[t]he mechanics of the legislative scheme demonstrate the General Assembly's intention that the baseline figure from which benefits are calculated should reasonably reflect the economic reality of a claimant's recent pre-injury earning experience, with some benefit of the doubt to be afforded to the claimant in the assessment." *Id.* We then concluded that we believed that the General Assembly "directed inclusion of concurrent wages in the benefits computation for precisely the same reason—to create a reasonable picture of a claimant's pre-injury earning experience for use as a projection of potential future wages and, correspondingly, earnings loss." *Id.* Turning to the specifically contested issue, the *Triangle Building Center* Court held that the claimant there had maintained a sufficiently intact, ongoing employment relationship with the concurrent employer that inclusion of the earnings attributable to that job was required to achieve a valid forecast of future earnings loss, notwithstanding the layoff. *Id.* at 1113.

*Hannaberry* likewise concluded that Section 309 was obviously intended to ensure an accurate calculation of wages in the myriad employment scenarios arising in todays work-

places. The question in *Hannaberry* was whether the General Assembly intended that a seriously and permanently injured full-time teenage worker, whose full-time employment was immediately preceded by part-time after-school employment, should be penalized by having the periods of part-time employment included in the calculation of his AWW. This Court held that inclusion of the quarters in which the claimant had worked part-time after school would lead to a demonstrably inaccurate underestimation of wages, and thus, the AWW was to be calculated using only the quarter in which the claimant had worked as a full-time employee.

In so holding, *Hannaberry* noted that it was apparent from the structure and language of Section 309 that "a 'fair ascertainment' of the employee's wages is the legislative intendment:"

> The "averaging" formula adopted in these provisions should generally result in an accurate assessment of the actual average weekly wages of employees, such as appellant, who are paid on an hourly basis. That such accuracy is the aim of the amendment is corroborated both by a comparison of new subsection (d) with the old—the old subsection permitted the employee to rely upon the highest calendar quarter, even if it were an aberration—and by the legislative history relied upon by the Commonwealth Court, *i.e.*, the remarks of Senator Armstrong, suggesting that it was necessary to "level the playing field" by eliminating the injured workers prior ability to rely exclusively upon an artificially peaked quarter of wages. By making the average weekly wage of these employees dependent upon an averaging of thirteen-week periods of employment, the amendment obviously was intended to lead to a calculation which would more accurately reflect the hourly worker's true wages.

834 A.2d at 533. The *Hannaberry* Court went on to note that the unusual part-time to full-time employment situation presented in that case revealed "a gap in the legislative movement toward greater accuracy in the calculation of average weekly wage." We declined to read the legislative failure to anticipate that precise circumstance as evidence of an inten-

tion to have the actual average wages of the employee grossly underestimated:

> The fact that the General Assembly did not anticipate this precise scenario is no reason to assume that it intended a result totally at odds with the otherwise logical and consistent slant of the legislation and its humanitarian purpose. We think that it would do extreme violence to Section 309 and the overall Act to assume that the Assembly *sub silentio* intended to single out employees in circumstances such as appellant's for special, punitive treatment based upon an unrealistic assessment of wages.

*Id.*

Because Section 309 did not address the work scenario at issue, and a reading of the statute which would require dilution of the benefit would be contrary to the overall humanitarian purpose of the Act, the *Hannaberry* Court turned to statutory construction principles and ultimately determined that the injured worker's periods of part-time employment could not be included in the calculation of his AWW. We noted, among other things, that this construction furthered the overall legislative purpose of Section 309 to provide for an accurate measurement of the AWW and would avoid an otherwise absurd and unreasonable result. We concluded as follows:

> By our holding today, we do not resurrect the former law, which specified that the most favorable quarter to the employee be the measure of average weekly wage. New-subsection (d) remains the governing law for those work paradigms for which it was intended, and averaging of the designated work periods is the formula.... We merely hold that subsection (d) does not control the calculation in a circumstance, such as this one, where it would lead to a grossly and demonstrably inaccurate measure of a worker's average weekly wage. At bottom, this case involves a circumstance, not uncommon in this complicated age, where the General Assembly did not specifically contemplate a certain factual scenario. But, we are not left without guidance. For the reasons we have specified above, we have no

difficulty in discerning the overall legislative intent to ensure accurate measurement and that intent, in turn, resolves the interpretive question presented herein.

*Id.* at 534.

*Hannaberry* and *Triangle Building Center* clearly control the outcome *sub judice* and require affirmance. The work scenario here, like that at issue in *Hannaberry,* is not specifically addressed by Section 309: *i.e.,* the Section is silent as to the proper approach where a previous work injury deflated the otherwise typical wages of an injured worker. *Hannaberry* highlights the humanitarian purpose of the Act and the clear legislative intention that injured workers entitled to benefits be paid a fair benefit based upon an **accurate** calculation of their actual history of earnings and earning capacity. *Triangle Building Center* recognized the same crucial points, *i.e.,* that the Act is humanitarian and remedial and, with respect to calculating AWW, it was designed with an eye toward "the economic reality of a claimant's recent pre-injury earning experience." 746 A.2d at 1112. It is not an accurate measure of economic reality to treat periods where no wages were earned solely because the worker was unfortunate enough to have suffered a previous work injury, as if the worker had no earning **capacity** for those periods. Such an approach would severely underestimate the reality of the worker's typical earnings, punish the worker for no reason approved in the legislation, and contradict the overriding legislative goal of accuracy in calculation.

What remains to be determined are the mechanics for calculating the benefit in cases, such as these, where a worker's actual wage receipts were artificially and atypically depressed solely because he was out on disability from a previous work injury. Both panels below determined that Section 309(d) controlled, but that, in making the calculation under that Section, relevant periods of compensated work disability should be computed by using the AWW that was already established for that first work injury. We agree with this approach. Although we do not go so far as the *Zerby* panel and hold that any other approach would involve an improper

recalculation of AWW and thereby cause a conflict with Section 423 of the Act,[8] we nevertheless agree that the simplest and most accurate measure of AWW in these cases is to accept the previously-established AWW as the measure for periods of work disability, and then apply the formula in Section 309(d). To the extent that the worker's average wages may have risen or fallen in the periods during which he was actually on the job and receiving wages in the previous year, the formula set forth in Section 309(d) will help ensure an accurate measurement.[9]

In *Hannaberry*, this Court recognized that an overriding concern of Section 309's computational methodology was to ensure that an injured worker does not receive more on workers' compensation than the amount he would have earned had he not been injured. 834 A.2d at 526–28, 533. By the same token, however, we recognized that the Act was not designed to punish a worker merely because a work calamity befell him. Thus, we noted that Section 309, as amended, was "an attempt to ensure that the calculation of wages would be a more accurate and realistic measure of what the employee could have expected to earn had he not been injured which, in turn, would ensure both that the employee was not over-compensated and the employer not over-burdened." *Id.* at 528. The Commonwealth Court's resolution of these appeals has kept the balance true. The workers here, like the worker in *Hannaberry*, are certainly not better off financially for having been injured, but neither are they being punished for a factor directly affecting their earning capacity which was a

8. The panel's discussion of Section 423 overlooked the fact that work factors, such as wages and hours, are not necessarily static—they may rise or fall. Thus, the AWW established for a previous work injury does not necessarily accurately reflect what a worker in fact will earn upon his return to the job. A calculation of an AWW based upon a work reality that comes into being only after a return to work from a previous work injury is not a "modification" or "recalculation" of the previous AWW; it is a new calculation of a succeeding reality.

9. We agree with the panels below that subsection 309(d.1) does not apply because that subsection, like Section 309(d), speaks in terms of "employment" and not "work." The fact that the Claimants in these appeals were not "working" during their periods of disability does not mean that they were no longer "employed" by their employers.

result of the job itself, and not the result of outside economic forces. Instead, consistent with the intention of the General Assembly, economic reality has prevailed.

For the reasons we have specified above, we affirm the orders of the Commonwealth Court.

Former Justice LAMB did not participate in the decision of this case.

Chief Justice CAPPY files a concurring opinion.

Justice EAKIN files a dissenting opinion.

Chief Justice CAPPY concurring.

I join the majority opinion, but write separately to set forth the construction that I believe the Statutory Construction Act of 1972, 1 Pa.C.S. § 1501 *et seq.*, requires of Section 309(d) of the Workers' Compensation Act, 77 P.S. § 582(d).

I conclude that the language of Section 309(d), specifically the phrase, "total wages," is not clear as to whether the General Assembly intended that claimants' previously established average weekly wage ("AWW") or the benefits they received for their first injuries be used in calculating the benefits they should be awarded for their second injuries. I, therefore, agree with the analysis under the Statutory Construction Act in which the majority engages, *see* 1 Pa.C.S. § 1921(c); with the majority's determination of legislative intent in this regard; and with the holding that relevant periods of compensated work disability in these cases should be computed by using the AWW that was established for claimants' first injury.[1] I, however, do not agree with and disassociate myself from any conclusion on the majority's part

1. I joined Mr. Justice Eakin's dissenting opinion in *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.)*, 575 Pa.66, 834 A.2d 524 (2003), having also concluded that there was no gap in Section 309(d) as to the calculation of benefits issue raised; that Section 309(d) spoke to the issue explicitly; and that Section 309(d) was to apply. For me, the instant case differs from *Hannaberry*. Here, Section 309(d) is not clear as to the calculation of benefits issue presented.

that Section 309(d) is silent on the calculation of benefits question claimants presented.

Justice EAKIN dissenting.

The majority relies on the analysis in *Hannaberry HVAC v. Workers' Compensation Appeal Bd. (Snyder, Jr.)*, 575 Pa.66, 834 A.2d 524 (2003), concluding that the average weekly wage established for a claimant's previous injury is to be used in calculating his average weekly wage for his second injury, instead of using the actual Workers' Compensation benefits received. I dissented in *Hannaberry*, and for the same reasons, must dissent in this case.

"When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Yet the majority does precisely that— § 309(d) says nothing about using a different method of computation when the relevant four consecutive 13–week periods include periods where benefits were received instead of salary, but the majority extrapolates this exception, citing the "overall humanitarian purpose of the Act," Majority Opinion, at 311–12, 870 A.2d at 885, and the legislative intent of ensuring a " 'fair ascertainment' of the employee's wages...." *Id.* (quoting *Hannaberry*, at 533).

The Legislature's desire presumptively includes an effort to ensure fairness, but if the Legislature provides a formula that is not "fair" in every circumstance, it is not the function of this Court to ignore the formula and create a new one.

The statute already provides, in clear, unambiguous terms, a method for computing the average wage; it is not ambiguous simply because the Legislature failed to make an exception for this particular employment scenario. Under the clear language of the statute, the claimants were employed within the meaning of § 309(d) for at least four consecutive, 13–week quarters the year before each was injured again. Most of that time, they were receiving Workers' Compensation benefits for their previous injuries, and these benefits are to be used in calculating benefits for their second injuries. While this may

not appear to be a "fair" result, in that claimants' new benefits are artificially deflated because their previous benefits were less than their salaries, "[a]rguments of unjust or uncomtemplated results of a legislative scheme do not amount to ambiguity, and courts should not manufacture ambiguity to avoid a disagreeable result." *Hannaberry*, at 535 (Eakin, J., dissenting). It is the province of the Legislature, not this Court, to make adjustments to a statute which, although not ambiguous, has created an unintended result. Judicial modification of unambiguous legislation in the name of "fairness" is a dangerous practice. Thus, I respectfully dissent.