Stephen D. WEISSMAN, Petitioner

v.

WORKERS' COMPENSATION APPEAL BOARD (PODIATRY CARE CENTER, P.C.), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 11, 2005.

Decided July 8, 2005.

John J. Del Casale, Philadelphia, for petitioner.

Janine A. Pavalone, Media, for respondent.

BEFORE: McGINLEY, Judge, COHN JUBELIRER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Stephen D. Weissman (Claimant) petitions for review from an order of the Workers' Compensation Appeal Board (Board) that affirmed the order of the Workers' Compensation Judge (WCJ) suspending his benefits. On appeal, Claimant argues that the WCJ erred: (1) in finding that he was not totally disabled; and, (2) in considering all of Claimant's self-employment earnings for purposes of calculating his earning capacity, but none of those earnings for purposes of calculating his average weekly wage (AWW).

This case has an extensive procedural history, which we summarize primarily from the WCJ's findings in his decision of January 31, 2003 (WCJ Decision 3).[1] Pri- or to sustaining a work injury, Claimant held two jobs and received income from both. In one job, he was employed by Podiatry Care Center, P.C. (Employer), a Subchapter "S" corporation, served as its president, and was its sole shareholder from 1995 until December, 1999. (WCJ Decision 3, Finding of Fact (FOF) ¶¶ 1, 2.), For Employer, he worked as a podiatrist, and his duties included, but were not limited to, performing foot surgery. (WCJ Decision 3, FOF ¶ 7.) The wages Claimant earned from Employer represented the profits of the corporation, and those profits were directly related to Claimant's ability to perform surgery. (WCJ Decision 3, FOF ¶ 13.) In a second job, Claimant was self-employed through a sole proprietorship trading under the name of Diagnostic X-ray Lab (DXL).[2] For DXL, Claimant provided medical/legal consulting services, wherein he reviewed medical records and documents and rendered his professional opinion. (WCJ Decision May 11, 1999 (WCJ Decision 1), FOF ¶ 3.) Both **before and after he sustained his work injury, Claimant performed his work at DXL** from which he received self-employment income.[3]

Claimant sustained a torn rotator cuff injury to his right shoulder on March 28, 1997, while working for Employer as a podiatrist. He began receiving total disability benefits for this injury in May 1997.[4] (WCJ Decision 3, FOF ¶ 8.) In

---

1. The same WCJ rendered three decisions in this case: one on May 11, 1999; another on July 24, 2000; and a third on January 31, 2003. Because all three decisions are pertinent to our analysis of this case, we introduce and identify them, respectively, as WCJ Decision 1, 2 and 3. Related Board decisions are also identified, respectively, as Board Decision 1 (November 7, 2000), Board Decision 2 (February 5, 2002), and Board Decision 3 (May 27, 2004).

2. The parties are in agreement that Claimant was self-employed. (N.T., 2–22–00, p. 86.)

3. Claimant's gross income from his medical/legal consulting work with DXL for calendar years 1995 through 1999 is as follows: 1995—$75,650; 1996—$62,987; 1997—$78,870; 1998—$105,942; 1999—$77,000. (WCJ Decision 3, FOF ¶ 32.)

4. Claimant began receiving total disability benefits as of May 30, 1997, pursuant to a

January 1998, Claimant returned to work for Employer, but experienced residual pain that prevented him from continuing his surgical practice. (WCJ Decision 3, FOF ¶¶ 10, 11.) He testified that even simple surgical procedures exacerbated his shoulder pain. (WCJ Decision 3, FOF ¶ 12.) Claimant's inability to treat patients due to his shoulder pain had a detrimental effect on his ability to earn income from Employer and, on March 1, 1999, he ceased functioning as a podiatric surgeon. (WCJ Decision 3, FOF ¶¶ 14, 18.) Because Employer's profits were directly related to Claimant's ability to perform surgery, Employer ceased functioning and its business was wound down on December 20, 1999. (WCJ Decision 3, FOF ¶¶ 13, 22.)

Meanwhile, Employer filed a Termination Petition dated May 8, 1998, alleging that Claimant had returned to work without a loss of earnings. (WCJ Decision 1, FOF ¶ 5.) At a pretrial hearing in June 1998, at Employer's request and without objection, the WCJ treated Employer's petition as a Petition for Suspension. *Id.* After a hearing held on January 13, 1999, the WCJ ordered that Employer pay Claimant **partial** disability benefits of $542.00 a week, beginning on January 8, 1998.[5] (WCJ Decision 1, Order.) The WCJ concluded that Employer had shown "through competent and credible evidence" that Claimant's disability had changed from total to partial as of that date. (WCJ Decision 1, Conclusion of Law (COL) ¶ 1.)

On July 1, 1999, Claimant filed a petition for reinstatement of temporary **total** disability benefits as of March 1, 1999, alleging a worsening of his condition. On August 24, 1999, Employer filed a Petition to Review the Notice of Compensation Payable (NCP), seeking to determine if Claimant had correctly calculated his AWW therein. The WCJ consolidated his review of Claimant's reinstatement petition and Employer's petition to review, and issued a second decision dated July 24, 2000 (WCJ Decision 2). In this decision, he first granted Claimant's petition to reinstate temporary total disability benefits as of March 1, 1999. The WCJ concluded that Claimant was no longer able to perform the duties of a podiatric surgeon because of his work injury, and had suffered a loss of earnings as a result thereof. (WCJ Decision 2, COL ¶ 1.) Second, the WCJ concluded that Employer had proven that "Claimant's average weekly wage as stated on the NCP was incorrect."[6] (WCJ Decision 2, COL ¶ 2.) The WCJ determined that Employer was, thus, entitled to credits for: (1) the disability payments re-

---

Notice of Compensation Payable (NCP) issued on September 17, 1997, by Employer's insurance carrier. (WCJ Decision 1, FOF ¶ 4.) In the NCP, Claimant's average weekly wage (AWW) was set forth as $1,923.00, and his compensation rate was $542.00. (WCJ Decision 1, FOF ¶ 4.)(Bd. Decision 2, February 5, 2002, p. 1.) Claimant received total disability benefits until January 7, 1998, at which time he returned to work.

5. By decision dated November 7, 2000, the Board affirmed this decision, in part, but remanded so that the WCJ could decide whether Employer was entitled to a credit for sickness and accident benefits received by Claimant. On remand, the WCJ deter-

mined that Employer was not entitled to a credit and the Board affirmed that decision. (Employer's Br. at 4, n. 1.)

6. During a hearing held on February 22, 2000, the parties orally stipulated that Claimant erred when he completed the wage worksheet sent to him by the State Workers' Insurance Fund, by **erroneously combining wages received from Employer with his self-employment income in calculating his pre-injury AWW.** (WCJ Decision 3, FOF ¶ 26; N.T., 2/22/00, at 86.) The NCP was amended to reflect only the income received from Claimant's employment with Employer; instead of $1,923.08, the amount was corrected to reflect $1,100.15. (WCJ Decision 3, FOF ¶ 27.)

ceived by Claimant; (2) any overpayment of compensation caused by miscalculation of the AWW; and (3) any *increase* in **Claimant's earnings after March 29, 1997, from his self-employment as a consultant with DXL.** (WCJ Decision 2, COL ¶ 4; FOF ¶ 50)(emphasis added).

By decision dated February 5, 2002 (Board Decision 2), the Board affirmed the WCJ's decision in part, reversed in part and remanded again. The Board did not agree that Claimant was totally disabled; it noted that Claimant's medical expert had testified during his deposition, on cross-examination, that Claimant was not totally disabled. (Bd. Decision 2 at 6) (citing Tr. 10/18/99, pp. 42, 59–60). The Board directed the WCJ on remand to determine the nature and extent of Claimant's **partial** disability. In addition, the Board did not agree that Employer should receive a credit **only for the increase** in Claimant's self-employment income after the injury, and ordered the WCJ to recalculate Claimant's **actual** self-employment earnings, taking into account **all** income he earned through his work at DXL during the period of disability. (Bd. Decision 2, Order.) On August 27, 2002, the WCJ held a hearing pursuant to the remand order, at which time the parties agreed they had no need to submit further evidence.

The WCJ circulated his third decision on January 31, 2003 (WCJ Decision 3). He

granted Employer's remanded Petition to Review; the WCJ stated that he was "constrained to compare" Claimant's pre-injury **wages** from Employer to his post-injury self-employment **earnings** from DXL, and *"constrained* to find that at all times relevant to these proceedings, the Claimant's post-injury average weekly wage **exceeded** his pre-injury average weekly wage." (WCJ Decision 3, FOF ¶ 33)(second emphasis added and first emphasis in original). Based on this determination, the WCJ suspended Claimant's weekly compensation benefits. He dismissed Claimant's remanded petition for reinstatement of total benefits noting that he was *"constrained* to find that at all times relevant ... Claimant was and continues to be able to perform some, although not all, of his duties as a podiatrist...." (WCJ Decision 3, FOF ¶ 34) (emphasis in original). The Board affirmed the WCJ's decision on May 27, 2004 (Board Decision 3). Claimant has appealed the Board's decision to our Court.[7]

On appeal, Claimant first argues that the WCJ erred when he found that Claimant did not satisfy the criteria for a finding of total disability.[8] He contends that the WCJ improperly isolated the testimony of one medical expert to support the conclusion that he was not totally disabled. In addition, Claimant contends that substantial evidence existed to support a finding that he was totally disabled from working as a podiatric surgeon.

---

7. The standard of review in workers' compensation appeals requires this Court to affirm the adjudication below unless we find that an error of law was committed, a party's constitutional rights were violated, or findings of fact are not supported by substantial evidence. 2 Pa.C.S. 704; *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.),* 575 Pa. 66, 834 A.2d 524 (2003). Our scope of review of Claimants second issue is plenary because we are dealing with a question of law. *Id.*

8. Compensation for total disability has no fixed duration. *Dillon v. Workmen's Comp. Appeal Bd. (Greenwich Collieries),* 536 Pa. 490, 495–96, 640 A.2d 386, 389 (1994). However, the Act places a limit on the amount of time a claimant may receive compensation for partial disability. *Id.* Partial disability ends when the maximum number of weeks has been reached, whether or not the claimant's earning power has returned to pre-injury level or remains at a reduced level because of injury. *Id.*

■ As a preliminary matter, we note that a WCJ may reasonably rely upon the testimony of a single medical expert to arrive at a finding of fact, despite conflicting medical evidence. *Robertshaw Controls Co. v. Workers' Comp. Appeal Bd. (Raffensperger)*, 710 A.2d 1232, 1234 (Pa. Cmwlth.1998). Therefore, contrary to Claimant's contention, the WCJ did not improperly isolate the testimony of one medical expert to support his findings.

■ Regarding Claimant's argument that substantial evidence of record supported a finding of total disability, it is well established that the term "disabled," as used in the Pennsylvania Workers' Compensation Act (Act),[9] is to be regarded as synonymous with "loss of earning power" attributable to a work-related injury. *Jeanes Hosp. v. Workers' Comp. Appeal Bd. (Hass)*, —— Pa. ——, n. 10, 872 A.2d 159, 167 n. 10 (2005) (citing *Woodward v. Pittsburgh Eng'g & Constr. Co.*, 293 Pa. 338, 340, 143 A. 21, 22 (1928)) ("Within the workers' compensation scheme, disability is the loss of earning power as expressed in diminished earning capacity"); *Brandywine Mazda Suzuki v. Workers' Comp. Appeal Bd. (Asman)*, 872 A.2d 253 (Pa. Cmwlth.2005); *CPV Mfg. v. Workers' Comp. Appeal Bd. (McGovern)*, 805 A.2d 653, 658 (Pa.Cmwlth.2002). "[W]e determine the degree of a worker's disability by reference to how the injury affected his earning power." *Kachinski v. Workmen's Comp. Appeal Bd. (Vepco Constr. Co.)*, 516 Pa. 240, 248, 532 A.2d 374, 378 (1987). In fact, both capacity to work and availability of work affect the extent of an injured employee's disability; for compensation purposes, disability may change from partial to total or vice versa based on a change in one with or without a change in the other. *Dillon v. Workmen's Comp.*

*Appeal Bd. (Greenwich Collieries)*, 536 Pa. 490, 501, 640 A.2d 386, 392 (1994).

■ In the context of a reinstatement petition, "where it has already been determined that a claimant is presently partially disabled, it is claimant's burden to show that he or she is further disabled, ... such that **claimant can no longer perform even the light-duty work which claimant could previously perform.**" *Barnett v. Workers' Comp. Appeal Bd. (Paul Riggle & Sons)*, 718 A.2d 901, 903 (Pa.Cmwlth. 1998) (emphasis added), *petition for allowance of appeal denied*, 559 Pa. 680, 739 A.2d 544 (1999).

■ Based on our review of the testimony of Claimant's medical expert, Eric M. Lipnack, D.O., we are not convinced that Claimant established the requisite change in the degree of his partial disability such that he would now be eligible for total disability benefits. Dr. Lipnack credibly testified on cross-examination that Claimant could perform almost all functions of his podiatry practice except for surgery. (Lipnack Dep. at 42, 52–60.) In addition, while the WCJ found that Claimants inability to perform surgery had a detrimental impact on his earning power, (WCJ Decision 3, FOF 14, 30), at no time did the WCJ determine that Claimants disability had increased or that he could no longer work as a consultant with DXL. In fact, Claimant testified that he has continued to receive income from his other job (with DXL), which requires that he consult with attorneys on various matters. (N.T., 1–13–99, p. 33.) Therefore, we agree with both the WCJ and the Board that Claimant has not experienced a total loss of earning power, and is not totally disabled under the Act.

Claimant next argues that the WCJ erred by considering **none** of Claimant's

---

**9.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2625.

self-employment income for purposes of calculating his AWW, but **all** of Claimant's self-employment income for purposes of calculating his earning capacity, when most of that same income existed both before and after the work injury. Claimant stresses that this method of calculation caused his earning capacity (self-employment income) after the injury to equal or exceed his AWW at the time of the injury (the wages he was previously paid by Employer), thus, precluding his right to receive disability benefits. He claims the WCJ's decision "has punished [him] for his diligence in pursuing two avenues of income," and asserts that the Board "did not understand the ramifications of its decision." (Claimant Br. at 18.) Claimant contends, instead, that the WCJ should have utilized in his calculations, **only the increase** in that self-employment income **after the injury.**

■ The Board affirmed the WCJ's decision of Claimant's second issue, relying upon this Court's opinion in *Bixler v. Workers' Comp. Appeal Bd. (Walden Books)*, 837 A.2d 1278 (Pa.Cmwlth.2003), *petition for allowance of appeal denied*, 580 Pa. 707, 860 A.2d 490 (2004), which noted that self-employment earnings may not be used for the purpose of calculating a claimant's pre-injury AWW under Section 309(e) of the Act, 77 P.S. § 582(e).[10] "Wages" are considered remuneration from an employer to an employee, and, since a claimant cannot act as both an employer **and** an employee at the same job, it is impossible for a self-employed claimant to receive "wages." *Id.*; *see also Borough of Honesdale v. Workmen's Comp. Appeal Bd. (Martin)*, 659 A.2d 70 (Pa.Cmwlth.1995), *petition for allowance*

*of appeal denied*, 543 Pa. 698, 670 A.2d 144 (1995); *Deichler v. Workmen's Comp. Appeal Bd. (Emhart/True Temper)*, 143 Pa. Cmwlth.189, 598 A.2d 1030 (1991), *petition for allowance of appeal denied*, 530 Pa. 662, 609 A.2d 169 (1992). Accordingly, Claimant's self-employment income was properly excluded from the calculation of his AWW.

■ This conclusion, however, presents an interesting dilemma: how are self-employment earnings that are present **both** before **and** after an injury to be handled? We are presented with a rather unique employment situation for which there is no precise statutory or common law authority. We know that when a claimant is partially disabled, and returns to work (or is capable of returning to work), the wages or income that the claimant receives (or would receive), must be deducted from or credited to the compensation payment the employer is required to provide to the claimant. *See* 77 P.S. § 772; *Kachinski.* In other words, employer pays less compensation to a partially disabled claimant when that claimant has earnings.

Here, we have a partially disabled Claimant who was self-employed both before and after his injury. Claimant's self-employment income from DXL after his injury was greater than the disability compensation payments he was due to receive from Employer. The WCJ and the Board, presumably following the well-known rule as previously articulated, credited **all** of Claimant's self-employment income against Employer's compensation payment amount. That amount was based on the calculation of Claimant's AWW, which included **no** self-employment income. This disparity caused Claimant to receive **no**

---

**10.** Section 309(e) of the Act provides in pertinent part: "Where the employe is working under concurrent contracts with two or more employers, his wages from all such employers shall be considered as if earned from the employer liable for compensation." 77 P.S. § 582(e).

compensation benefits whatsoever. Where, **before** his injury, Claimant received both earnings from DXL and wages from Employer, **after** his injury, Claimant is receiving earnings solely from DXL. The opinions of the WCJ and the Board allow Employer to credit all of Claimant's self-employment income against his compensation benefits, thus giving Employer a windfall and punishing Claimant with a significant loss of income.

In its argument supporting the decisions of the WCJ and the Board, Employer relies upon *Capuano v. Workers' Comp. Appeal Bd. (Boeing Helicopter Co.)*, 724 A.2d 407 (Pa.Cmwlth.1999). In *Capuano*, this Court held that earnings from self-employment income must be taken into account when determining a claimant's earnings or earning capacity. *Id.* at 413. In fact, this Court has held that self-employment income earned by an individual receiving workers' compensation benefits may be credited against the amount of benefits which the employer must pay. *Univ. of Pittsburgh v. Workers' Comp. Appeal Bd. (Johnson)*, 167 Pa.Cmwlth.643, 648 A.2d 1315 (1994).

However, neither *Capuano* nor *University of Pittsburgh* deals with the same

factual situation or the precise issue that we have here, because in both cases, the self-employment income began only **after** the claimant's injury.[11] WCJ Carl M. Lorine addressed the unique situation here by initially refusing to allow the **total amount** of self-employment income that Claimant was earning after his injury to be credited to Employer, which would have eliminated Claimant's compensation payments. In his first decision, the WCJ wrote:

> Since one is precluded from using in the calculation of his pre-injury average weekly wage monies earned in concurrent self-employment, *fairness would dictate that **only the increase in monies earned in such self-employment after the work injury** should be included for compensation purposes in the calculation of post-work injury wages.* This is especially true in matters such as the one sub judice where the duties between the pre-injury employment and post-injury self-employment are different. The aforesaid method does not allow either the [Employer] or Claimant to profit from an abuse of self-employment earnings and establishes a baseline for the calculation of the Claimants fu-

---

11. In both *Capuano* and *University of Pittsburgh*, the claimants did not enter into "second jobs" until **after** they were injured.

In *Capuano*, the claimant worked for the employer as a tool and pattern maker when he suffered a work-related injury. He began to receive benefits pursuant to an NCP. Approximately three years later, the employer filed a petition for modification and suspension, alleging that the claimant had returned to work at an undetermined earning power three months after sustaining his injury. The WCJ found that the evidence supported the conclusion that claimant had returned to work as a self-employed roofing contractor, and that earnings from the roofing job could be taken into consideration in determining his earnings or earning capacity for purposes of adjudicating a petition for modification.

The *University of Pittsburgh* employed the claimant as a janitor, who suffered a work-related injury, began receiving benefits and, five months later, executed a final receipt which stated that he was able to return to work that same day. He did not return to work at the university and was not offered any suitable work thereafter. Instead, the claimant began performing light work for his brother's ministry for which he received free room and board. The claimant filed a petition to set aside the final receipt, which the WCJ granted. The employer argued that it was entitled to a credit for the value of board and lodging paid to the claimant for his work at this brother's ministry. This Court agreed.

ture earnings for compensation purposes.

(WCJ Decision 1, FOF 12) (emphasis added). In his second decision, the WCJ also found that Employer was entitled to a credit "with regard to the monies earned by the Claimant *as a consultant* trading as [DXL], for any *increase* in such earning after March 29, 1997 as compared to monies earned prior thereto." (WCJ Decision 2, FOF 50) (emphasis in original). The WCJ further explained:

> The reason for limiting the credit regarding the Claimants earnings as a consultant with [DXL] is based on the fact that *monies earned as a consultant could not be included in the calculation of the Claimants average weekly wage and, thus, it would appear equitable to allow only an increase in those monies earned after the date of injury to be considered post-injury earnings.* To do otherwise would, in some case, lead to the absurd result of prohibiting a Claimant, similarly situated, from ever collecting weekly benefits notwithstanding his total inability to perform his pre-injury job and not withstanding a significant loss in income.

(WCJ Decision 2, addendum to FOF 50)(emphasis added). In some respects, this approach foreshadowed the Supreme Courts reasoning in its recent opinion in *Colpetzer v. Workers' Comp. Appeal Bd. (Standard Steel)*, —— Pa. ——, 870 A.2d 875 (2005) (Colpetzer II),[12] in which it looked at the "economic reality" of a claimant's pre-injury earning experience.

*Colpetzer II* addresses the proper manner of calculating a claimant's AWW when his employment situation was not specifically addressed by the statute. In performing its analysis of the calculation of the AWW in *Colpetzer II*, the Supreme Court relied heavily on two decisions: *Triangle Bldg. Ctr. v. Workers' Comp. Appeal Bd. (Linch)*, 560 Pa. 540, 746 A.2d 1108 (2000) and *Hannaberry*. The Court in *Colpetzer II* stated that:

> *Hannaberry* and *Triangle Building Center* clearly control the outcome *sub judice* and require affirmance. The work scenario here, like that at issue in *Hannaberry*, is not specifically addressed by Section 309: *i.e.*, the Section is silent as to the proper approach where a previous work injury deflated the otherwise typical wages of an injured worker. *Hannaberry* highlights the humanitarian purpose of the Act and the clear legislative intention that injured workers entitled to benefits be paid a fair benefit based upon an **accurate** calculation of their actual history of earnings and earning capacity. *Triangle Building Center* recognized the same crucial points, *i.e.*, that the Act is humanitarian and remedial and, with respect to calculating AWW, it was designed with an eye toward "the economic reality of a claimant's recent pre-injury earning experience." It is not an accurate measure of economic reality to treat periods where no wages were earned solely because the worker was unfortunate enough to have suffered a previous

---

**12.** In *Colpetzer II*, the Supreme Court jointly dealt with appeals from two Commonwealth Court decisions: *Colpetzer v. Workers' Comp. Appeal Bd. (Standard Steel)*, 802 A.2d 1233 (Pa.Cmwlth.2002) (*Colpetzer I*) and *Zerby v. Workers' Comp. Appeal Bd. (Reading Anthracite Co.)*, 821 A.2d 193 (Pa.Cmwlth.2003) (en banc). The question presented was:

> [W]hether the General Assembly intended that a worker who receives workers' compensation benefits resulting from a workplace injury, and who then returns to work and sustains a new injury, should be penalized by including in the computation of his AWW periods when he earned no wages because of the initial work injury.

*Colpetzer II*, —— Pa. at ——, 870 A.2d at 876.

work injury, as if the worker had no earning **capacity** for those periods. Such an approach would severely under-estimate the reality of the worker's typical earnings, punish the worker for no reason approved in the legislation, and contradict the overriding legislative goal of accuracy in calculation.

*Id.* at ——, 870 A.2d at 886 (emphasis in original and citation omitted).

Thus, the Court in *Colpetzer II* sought to prevent the "windfall" that would inevitably be awarded to employers and insurers based upon "fortuitous circumstances" having nothing to do with the accurate assessment of a worker's true "average" wages. *Id.* at ——, 870 A.2d at 883. In so doing, the Supreme Court focused on the need "to create a reasonable picture of a claimant's pre-injury earning experience for use as a projection of potential future wages and, correspondingly, earnings loss." *Id.* at ——, 870 A.2d at 884 (quoting *Triangle Bldg. Ctr.*, 746 A.2d at 1112.) The approach requires that "some reasonable assessment must be made of claimants' pre-injury ability to generate future earnings." *Id.* (quoting *Triangle Bldg. Ctr.*, 746 A.2d at 1112.) It is important that "the baseline figure from which benefits are calculated should reasonably reflect the economic reality of a claimant's recent pre-injury earning experience . . . ." *Id.* (quoting *Triangle Bldg. Ctr.*, 746 A.2d at 1112).

▌ Applying this approach to the case sub judice, we note that the wages Claimant earned from Employer, used in the calculation of his AWW, did not reasonably or accurately reflect the economic reality of his pre-injury earning experience for use as a projection of potential future wages and, correspondingly, earnings loss. The · economic reality of his pre-injury

earning experience included the existence of his self-employment income, which correctly should not be included in the AWW calculation. However, allowing the employer a credit for the **entire** amount of the self-employment income he had earned prior to his injury, against its payment of his workers' compensation benefits would be a windfall to Employer, based on the fortuitous circumstances that Claimant's employment injury did not prevent him from continuing his self-employment. Of course, any increase in self-employment income that Claimant earns after his work injury would be credited against his compensation benefits, consistent with *Capuano* and *University of Pittsburgh*, as would any other income Claimant might earn.

▌ The Act was not designed to punish a worker simply because he suffered a work injury. *Colpetzer II,* at ——, 870 A.2d at 887. The amendment to Section 309,[13] governing the calculation of an employee's AWW, was "an attempt to insure that the calculation of wages would be a more accurate and realistic measure of what the employee could have expected to earn had he not been injured, which, in turn, would ensure both that the employee was not over-compensated and the employer not over-burdened." *Id.* (quoting *Hannaberry,* 834 A.2d at 528). Applying the *Colpetzer II* approach here ensures that Claimant will not be punished after his injury simply because he had the initiative to work for Employer and, at the same time, for himself. This approach may not make Claimant financially whole, but it ensures that, "consistent with the intention of the General Assembly, economic reality has prevailed." *Id.*

Accordingly, the order of the Board is affirmed in part as to the determination of Claimant's partial disability, ·reversed in

---

13. Section 309 was amended by Section 5 of the Act of June 24, 1996, P.L. 350 (Act 57).

part and the matter remanded for recalculation of Claimant's post-work injury earnings consistent with the analysis in this opinion.

## ORDER

NOW, July 8, 2005, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed in part, reversed in part and the matter is remanded for proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.