IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dunbar Armored and          :
Arch Insurance Company/       :
TPA Gallagher Bassett Services,  :
           Petitioners    :
                                   :
        v.                :  No. 463 C.D. 2021
                                   :  SUBMITTED: December 13, 2021
Zackery Fisher (Workers'       :
Compensation Appeal Board),   :
           Respondent   :


BEFORE:   HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE ELLEN CEISLER, Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                               FILED: February 4, 2022

      Dunbar Armored, Arch Insurance Company, and TPA Gallagher Bassett Services (collectively, Employer) petition for review of the March 30, 2021 order by the Workers' Compensation Appeal Board (Board), which affirmed a Workers' Compensation Judge's (WCJ) decision to award Workers' Compensation (WC) benefits to employee Zackery Fisher (Claimant). Employer argues that the Board should have reversed the WCJ's decision due to his failure to issue a reasoned decision. Upon review, we reverse on the basis that the WCJ's decision was not supported by substantial evidence.

# I. Background

Claimant worked for Employer, an operator of armored trucks, for several years as a coin vault teller.[1] His duties included loading and unloading wooden skids and other bulky items on and off hand-operated pallet trucks. Reproduced Record (R.R.) at 155a. Claimant performed these tasks in a poorly ventilated space inside a warehouse. *Id*. On the morning of January 9, 2019, while working in the coin vault, Claimant began to feel dizzy and experienced difficulty writing. *Id*. He was taken to a hospital where a doctor determined that he had been exposed to carbon monoxide. *Id*.

In the weeks following the incident, Claimant began experiencing shortness of breath and difficulty concentrating. *Id*. at 171a. In late February, he visited a family physician to seek treatment for those symptoms. The physician prescribed an antidepressant. *Id*. at 172a. Claimant also purchased a carbon monoxide detector at his own expense and placed it near his workspace. On March 11, the detector sounded its alarm, and Claimant's supervisor evacuated the three or four employees then inside the building. *Id*. at 175a. There is no record that Claimant was exposed to, or sought treatment for, carbon monoxide fumes in that incident. He was emotionally shaken, however, and excused to go home. *Id*. He did not return to work for four months.

On April 11, 2019, Claimant submitted a workers' compensation claim. *Id*. at 17a. In his petition, Claimant alleged that he suffered from "[c]arbon monoxide poisoning and [post-traumatic stress disorder]". The petition explained that Claimant's "[e]xposure to carbon monoxide" caused "severe illness which led to panic attacks." *Id*. Claimant asserted that this injury was the cause of his inability to

---

[1] The record is inconsistent as to Claimant's start date. Various sources say he began working for Employer in 2011, 2013, or 2014.

work. *Id.* On the same day, Claimant submitted a separate Petition for Penalties asserting that Employer had "failed to accept or deny this claim and issued no Bureau documents in accordance with the [WC] Act."[2] *Id.* at 8a. It called for a penalty of 50% of WC benefits for the alleged violation, plus counsel fees for an unreasonable contest under Section 440 of the WC Act.[3] Employer filed timely Answers denying the allegations in both petitions. *Id.* at 14a, 24a.

**Claimant's testimony**

Claimant testified at a hearing before the WCJ on July 18, 2019. He recounted that, on the morning of January 9, he was "fixing the floor in the coin vault." July 18 Hearing, Notes of Testimony (N.T.) at 8. When he rose to fill out paperwork, he noticed that he "didn't have control of [his] left hand," and felt as though he was "going to pass out." *Id.* at 9. Claimant's coworker summoned Claimant's supervisor, who drove him to the emergency room at York Hospital. Claimant felt "a little bit dizzy" upon his release after a few hours and spent the rest of the day at home. *Id.* at 12.

Upon Claimant's return to work the next day, his supervisor informed him that the gas heater in the coin vault area had malfunctioned and had been disconnected as a result of the incident. *Id.* at 12-13. The supervisor also instructed Claimant to visit a nearby Concentra medical office. The evaluating physician

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710. Claimant's penalty petition did not cite to a specific provision in the WC Act. However, Claimant's appeal to this Court indicates that the petition was referring to Employer's requirement to accept or deny compensation following a workplace injury within 21 days. *See Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 169-70 (Pa. Cmwlth. 2003) (holding that employer had an obligation to accept or deny workplace injury within 21 days notwithstanding the fact that claimant suffered no loss of wages) (citing 406.1 of the WC Act, added by the Act of Feb. 8, 1972, P.L. 25, 77 P.S. § 717.1).

[3] Added by the Act of Feb. 8, 1972, P.L. 25, 77 P.S. § 996.

released Claimant to return to work without restrictions, and without prescribing medication. *Id.* at 13-14.

From January through March, 2019, Claimant experienced moments when he felt "like [he] couldn't breathe, and that [he] couldn't process [his] thoughts clearly." *Id.* at 16. He testified that he would often pace the floor at work, and that he was "struggling to eat and drink." *Id.* He attributed those symptoms to his fear of "[a]nother carbon monoxide leak," and so purchased a carbon monoxide detector to keep near him at work. *Id.* at 16-17. One evening in late February, Claimant visited an urgent care practice in hopes of receiving "a mental evaluation." *Id.* at 18. The attending physician referred Claimant to Dr. Rita Clayton, a family doctor, whom Claimant visited the following day. That visit, and subsequent visits, to Dr. Clayton's practice are described in the section immediately below. The physician did not excuse Claimant from work or prescribe any medication. *Id.* at 19.

On March 11, 2019, the carbon monoxide detector that Claimant had purchased sounded its alarm. Claimant notified his branch manager, who evacuated the three or four employees then inside the building. Claimant went through "an emotional spiral," and was excused from work for the remainder of the afternoon. *Id.* at 17. He returned to Dr. Clayton's office on the following day, where he described his workplace difficulties. Dr. Clayton's response—according to Claimant's own paraphrase—was that he "should take some time from work." *Id.* at 19. Accordingly, she wrote him a note asking that he be excused for "[t]wo weeks to try to find a counselor."[4] *Id.* at 43.

On the subject of his absence from work, Claimant offered statements that were not entirely in harmony. When asked by Employer's counsel for the name of

---

[4] Claimant's recollection of that length of time is contradicted by Dr. Clayton's notes, discussed *infra*, which indicate that he was given a work note only for "this week." R.R. at 175a.

the physician who was "keeping [him] off work" for the near-four-month period, Claimant replied, "Rita Clayton." *Id.* at 42. He then clarified that he was referring to the note that Dr. Clayton had given him on March 12, 2019. *Id.* at 42-43. Claimant acknowledged that the note imposed no restrictions on his duties. *Id.* He also conceded that, at the end of the two-week period that he claimed the note excused him from work, he did not report back to work. Rather, he took a vacation to Florida to visit family, a trip for which he flew in an airplane for the first time. *Id.* at 43-44. Claimant also acknowledged that, during his extended absence, his doctors at Family Health Associates (the name of Dr. Clayton's practice) told him that "it would be helpful for [him] to return to work." *Id.* at 42.

Claimant testified that he returned to work on July 5, 2019. *Id.* at 23. At the time of his testimony, he was working in the same position, and in the same location, with his carbon monoxide detector still in place. *Id.* at 24. There is no evidence that Claimant discussed the possibility of light duty with Employer, whether before or after his return. Describing his relationship with his supervisor since his July return, Claimant testified that the supervisor "understands the situation that I was struggling to coping with working in the same workplace, I guess, and having [symptoms of anxiety]. So, he's been very generous with me and working with me and we're just trying to get me back to 110 percent." *Id.* at 48.

**Claimant's medical history**

From January 2019 until his return to work in July, Claimant received the following medical treatment:

• The visit to the York Hospital emergency room (ER) following the January 9, 2019 carbon monoxide exposure incident. R.R. at 154a.

5

• The evaluation by a staff physician at Concentra on the following day. N.T. at 12-13.

• Claimant's visit to an urgent care center on the evening of February 26, 2019, in pursuit of "a mental evaluation." *Id.* at 18-19.

• Five appointments with Dr. Rita Clayton, a family physician, between February 27 and May 3, 2019. R.R. at 170a-184a.

• Four appointments with Katherine Weber, a licensed professional counselor, between April 2 and May 2, 2019. *Id.* at 171a-183a.

Claimant submitted the report from the ER visit, Dr. Clayton's notes, and notes from his sessions with Ms. Weber as his medical exhibits. They are summarized below.

### The York Hospital ER visit

On the morning of January 9, 2019, when Claimant experienced dizziness and numbness in his left hand, his supervisor drove him to York Hospital. Medical staff there administered tests of Claimant's blood and discovered elevated levels of carbon monoxide in his hemoglobin. R.R. at 154a. The numbness in his hand, which is listed in the report as his "chief complaint," vanished after "approximately 10 minutes." *Id.* at 155a. Claimant's feelings of being flushed and lightheaded "improved" "[a]s soon as he got to the emergency department." After three hours, the ER treating physician discharged Claimant since Claimant's symptoms were "fully resolved" and that he was "acting at his baseline self." *Id.* at 154a.

### Claimant's appointments with Dr. Rita Clayton

The urgent care center that Claimant visited on the evening of February 26, 2019, referred him to Dr. Clayton, whom he saw on the following day. In her notes from that appointment, Dr. Clayton indicated that Claimant was suffering from

6

"anxiety, panic attacks, racing heart, palpitations and inability to sleep when thinking about work the next day." *Id*. at 172a. She prescribed an antidepressant. *Id.*

On March 12, 2019, Claimant had a follow-up appointment with Dr. Clayton. They discussed Claimant's anxiety symptoms, which persisted but were "improving," according to the doctor. *Id.* at 174a. They also discussed the carbon monoxide alarm incident, which occurred the previous day, and Claimant's fear that his workplace safety concerns were not being addressed. *Id*. at 175a. "[He] is feeling he cannot handle it [at] work right now," she wrote. *Id.* Dr. Clayton urged Claimant to seek counseling. She also provided Claimant with a note requesting that Claimant be excused from work for the following week so that he would have an opportunity to find a counselor, and to "work on stress reduction, relaxation techniques . . . and nutrition." *Id.* At the end of the one-week period, the doctor wrote that she would "re-evaluate his return to work." *Id.*

Another follow-up with Dr. Clayton occurred on March 19, 2019. According to Dr. Clayton's notes, Claimant reported that he was "feeling well" and his symptoms, such as lack of sleep and poor appetite, were "improving." *Id*. at 177a-178a. The two discussed several issues in Claimant's personal life, including Claimant's upcoming trip to Florida; they also discussed "lifestyle changes" that Claimant was making to improve his financial situation. *Id.* There was a brief discussion of Claimant's work situation as well. Dr. Clayton noted that Claimant "does not feel that he is able to go back to work at this time" and that Claimant reported being unable to do "light duty." *Id.*

After his April 3 appointment, Dr. Clayton noted that there were "[n]o new complaints at [that] time," and that Claimant's condition was still "improving." *Id.* at 180a. She recorded that Claimant had begun seeing a counselor the day before.

The doctor's only mention of Claimant's work situation was her note that Claimant's counselor had expressed to him her opinion that "going back to work would be a good idea." *Id.* at 181a.

After his final appointment with Dr. Clayton on May 3, 2019, she only mentioned Claimant's work while noting that it "continues to be very stressful. He feels he is handling it to the best of his ability." *Id.* at 183a. Claimant still had not returned to work.

### *Claimant's counseling sessions*

While Claimant continued to see Dr. Clayton, he followed her recommendation to seek counseling. On April 2, 2019, he met with Katherine Weber, a licensed professional counselor at Yorlan Psychological Associates. During their intake session, they discussed Claimant's workplace difficulties. *Id.* at 161a. To cope with those difficulties, Ms. Weber urged Claimant to "focus on self-care, simplifying his life as much as he can control, good sleep hygiene and nutrition," and "limiting the time he spends each day thinking about the situation and shifting focus to other purposes." *Id.* As noted above, *Ms. Weber also suggested that it would be a good idea for Claimant to return to work*. *Id.* at 181a. Claimant did not return to work.

Claimant attended three subsequent sessions with Ms. Weber in April and May, 2019, during which they discussed a range of stressful events in Claimant's private life. These included Claimant's financial problems, his girlfriend's health issues, his girlfriend's sister's health issues, and an ongoing dispute with his father over who would care for Claimant's grandparents. R.R. at 161a, 163a, 166a, and 168a. When they did resume discussion of Claimant's job, Ms. Weber still did not impose restrictions on Claimant's duties or place conditions on his return.

8

Claimant discontinued the counseling sessions after his last appointment on May 3, 2019. According to Claimant, his employer-sponsored health insurance did not cover these sessions and he had difficulty paying the fees out-of-pocket. *Id.* at 129a. Claimant did not seek a payment plan or a lower-cost alternative. *Id.* at 129a-130a. Nor did he seek further medical attention between May 6, 2019 and his eventual return to work on July 5, 2019. *Id.* at 130a.

### *The report from Employer's medical expert*

In August, Employer submitted the written report of its medical expert, Dr. Larry Rotenberg, a psychiatrist at Reading Hospital and psychiatry professor at Temple University School of Medicine. *Id.* at 195a-208a. On August 14, 2019, Dr. Rotenberg conducted a two-hour, in-person evaluation of Claimant. At the evaluation, Claimant underwent a series of psychological tests. Based on the evaluation, the tests, and Claimant's medical records, Dr. Rotenberg concluded that Claimant had never suffered from PTSD. Dr. Rotenberg opined that, "[a]t the most," Claimant "might have had an Adjustment Disorder with anxious mood," which lasted for "weeks." *Id.* at 206a. He characterized the antidepressant dosage prescribed by Dr. Clayton as "sub-therapeutic" and "essentially a placebo." *Id.* at 205a. According to Dr. Rotenberg, Claimant's persistent anxiety issues have "absolutely nothing to do with either the January the 9th or the March 11th incident of exposure to [c]arbon [m]onoxide."[5] *Id.* He suggested that any elevated levels of carbon monoxide observed in Claimant's body may have been the result of the pack of cigarettes that Claimant had smoked daily until July 2019. *Id.*

---

[5] As indicated earlier, there is no evidence in the record that Claimant was actually exposed to, or treated for, carbon monoxide exposure as a result of the March 11 incident.

On January 3, 2020, the WCJ issued a decision in Claimant's favor. The WCJ wrote that Claimant's testimony was "credible and persuasive," a conclusion that he based on his own "observations and Claimant's presentation and demeanor [at] his live testimony." Decision of the WCJ, Findings of Fact (FOF) ¶7. In his interpretation, the records from York Hospital, Dr. Clayton and Ms. Weber constituted evidence "that Claimant sustained disabling work-related injury of carbon monoxide poisoning and PTSD." *Id.* The WCJ found the opinion of Dr. Rotenberg, Employer's medical expert, to be "not credible or reliable to the extent it conflicts with that of Claimant" without further explanation. FOF ¶ 9.

The WCJ's Order granted Claimant temporary total disability benefits of $524.50 per week, plus reimbursement for reasonable and necessary medical costs. WCJ Order ¶¶ 2-3. The WCJ awarded benefits starting on January 9, 2019, despite the fact that Claimant continued to work for two months after that date, and despite the fact that both parties had already agreed that the period of any alleged disability did not begin until March 12, 2019.[6] Board Opinion (Op.) at 1. The WCJ suspended Claimant's benefits as of July 5, 2019, the date of Claimant's return to work. The WCJ denied Claimant's request for counsel fees, but granted the request for a 50% penalty. WCJ Order ¶¶ 5-6.

Employer filed a timely appeal to the Board. R.R. at 42a-46a. Employer argued that, contrary to the WCJ's opinion, Claimant had not produced any medical proof regarding the cause of Claimant's alleged injuries; that Claimant had failed to produce evidence that substantiates claims of work-related disability or wage loss;

_____

[6] The WCJ's opinion also noted without explanation that "Claimant submitted . . . documentation indicating ongoing child support obligations." FOF ¶ 13. Claimant's child support lien affidavit showed no such obligations. R.R. at 185a-86a. Indeed, Claimant was childless as of 2019. *Id.* at 196a.

that the benefits should have been terminated, rather than suspended; that the WCJ's ruling was not a reasoned decision; and that the 50% penalty, or any penalty at all, was unjustifiable.[7]

On March 30, 2021, the Board affirmed the WCJ by a 4-2 vote. In its opinion, the majority explained that the WCJ is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses (citing *Greenwich Collieries v. Workmen's Comp. Appeal Bd. (Buck)*, 664 A.2d 703 (Pa. Cmwlth.1995)). Board Op. at 5. The majority characterized Employer's arguments as a call to reassess the credibility and weight given to the evidence, which is the WCJ's prerogative, not the Board's (citing *Vols v. Workmen's Comp. Appeal Bd. (Alperin, Inc.)*, 637 A.2d 711 (Pa. Cmwlth. 1994)). *Id.* Because the WCJ accepted Claimant's testimony and evidence, and rejected Employer's medical expert's report, "Claimant was able to meet his burden." *Id.* The majority did agree that the WCJ erred by granting benefits dating to January 2019, and modified the award to reflect the parties' agreement that the period began in March 2019. *Id.*

Board Chairman Frioni and Commissioner Zurick dissented without submitting separate opinions. Board Op. at 9-10. Commissioner Zurick did briefly note, regarding the award of penalties, that he did not "see, even given a notice violation of the Act, how the WCJ gets from 10% to a 50% Penalty under the [WC Act]." Board Op. at 10.

Employer timely appealed the Board's decision to this Court.

---

[7] Employer also requested supersedeas pending appeal, which was **granted** on February 20, 2020. Employer Br. at 7.

11

## II. Issues

On appeal,[8] Employer argues that Claimant failed to meet his burden of proof because there is no medical evidence in the record to establish that a work-related injury caused a disability. In the alternative, Employer maintains that even if benefits were properly granted, the WCJ should have terminated rather than suspended payments, since there was no evidence of ongoing disability. Employer also argues that the WCJ's decision is not "reasoned," in violation of Section 422(a) of the Act, 77 P.S. § 834, due to the WCJ's failure to provide any basis for rejecting the opinions of Dr. Rotenberg, Employer's medical expert.[9] Employer also asks this Court to reverse the penalty award, since it lacked justification and was an error as a matter of law. Employer's Br. at 26.

## III. Analysis

It is well established that the term "disabled," as used in the Pennsylvania WC Act, is to be regarded as synonymous with "loss of earning power" attributable to a work-related injury. *Weissman v. Workers' Comp. Appeal Bd. (Podiatry Care Ctr., P.C.)*, 878 A.2d 953, 958 (Pa. Cmwlth. 2005). Therefore, a causal connection between the work-related injury suffered and a loss of wages must be demonstrated

---

[8] The scope of appellate review in a workers' compensation proceeding is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact are supported by substantial evidence. *Gumro v. Workmen's Comp. Appeal Bd. (Emerald Mines Corp.)*, 626 A.2d 94, 97 (Pa. 1993). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Bethenergy Mines, Inc., v. Workmen's Comp. Appeal Bd. (Consol. Coal Co.)*, 612 A.2d 434, 436 (1992). Hence, appellate review must focus on whether there is rational support in the record, when reviewed as a whole, for the agency action. *Republic Steel Corp. v. Workmen's Comp. Appeal Bd. (Shinsky)*, 421 A.2d 1060, 1063 (Pa. 1980).

[9] Since we hold that the first issue is dispositive in this case, there is no need to reach the questions regarding the suspension of benefits or the reasoned decision standard. They are therefore omitted from the discussion below.

in order to receive an award of wage loss benefits. *CPV Mfg. Inc. v. Workers' Comp. Appeal Bd. (McGovern)*, 805 A.2d 653, 658 (Pa. Cmwlth. 2002). A loss of wages caused by an employee's **voluntary** decision not to work is not compensable. *Brimmer v. Workers' Comp. Appeal Bd. (N. Am. Refractories)*, 764 A.2d 104, 107 (Pa. Cmwlth. 2000).

Upon review of the record, we find that it does not support, by substantial evidence, the WCJ's decision that Claimant suffered a disabling work injury.

The medical records offered by the Claimant consist, in their entirety, of the emergency room visit of January 9, 2019, counselor Katherine Weber's notes from her four counseling sessions with Claimant, and family physician Dr. Rita Clayton's notes from her five visits with Claimant. Claimant argues, the records demonstrate that "the WCJ's determinations are unquestionably supported by substantial evidence of record." Claimant's Br. at 11. We disagree.

While these records indicate that Claimant was exposed to carbon monoxide on January 9, 2019, there is not a single medical record or opinion that concluded that this exposure resulted in a disabling work injury. Rather, these records show that Claimant's four-month absence from work was *voluntary,* as opposed to medically recommended. Claimant was released from the ER within hours, with no symptoms, and without work restrictions. Claimant's family physician never imposed any restrictions, and her notes indicate that Claimant's decision not to return to work was his own choice. She and Claimant's counselor, moreover, both *encouraged* Claimant to return to work. Therefore, Claimant has failed to meet his burden of proof that he was disabled for the period he alleges. Since the Act does not compensate the loss of wages resulting from an employee's choice not to work, benefits cannot be properly awarded in this case.

It is true that Claimant's anxiety symptoms lasted much longer than those of his carbon monoxide exposure. However, there was still no conclusion by a medical professional that those symptoms constituted a disability. Dr. Clayton's March 12, 2019 note excusing Claimant from work for one week did not address the question of whether he *could* work. In fact, the doctor's written remark from one week later—that *Claimant* "does not feel that he is able to return to work at this time"—indicates that his continued absence from work was his own decision. R.R. at 178a. By Claimant's own admission, the doctor had in fact advised him to return to work. N.T. at 43. Additionally, on April 2, 2019, counselor Katherine Weber specifically told Claimant that going back to work would have been advisable. R.R. at 181a. It strains credulity to suggest that both a physician and a licensed professional counselor would have advised Claimant to return to his job if they had truly believed that he was disabled.

Even if we were to interpret "disability" broadly enough to include Claimant's anxiety issues, his claim that they were caused by a work injury is not adequately supported by the evidence. In a WC claim, the causal connection between a work-related injury and the alleged disability must be either obvious or supported by unequivocal medical testimony. *Fotta v. Workmen's Comp. Appeal Bd. (U.S. Steel/USX Corp. Maple Creek Mine)*, 626 A.2d 1144, 1146 (Pa. 1993). In this case, the medical records indicate that Claimant's anxieties center on the myriad of personal family and financial issues, unrelated to work, that he discussed extensively with his physician and his counselor. To single out the January 9 and March 11, 2019 incidents among those factors would therefore require unequivocal medical testimony. But the medical evidence in the record offers no such thing. Neither Dr.

14

Clayton nor Ms. Weber discusses the varying degrees to which the different factors caused Claimant's anxiety. They barely discuss causation at all.

Employer next argues that the assessment of a 50% penalty by the WCJ was improper since there was no violation of the WC Act justifying this penalty. The WC Act provides that employers and insurers may be assessed a penalty, calculated as a percentage of the benefits awarded, for violations of the Act, its rules or regulations, or its rules of procedure.[10] The penalty is paid to the beneficiary. In ordinary cases the penalty may not exceed 10% of the amount awarded. However, in cases of unreasonable or excessive delays, it may be increased to 50%. *Id.*

Section 406.1 of the WC Act imposes on employers an obligation to accept or deny the work-relatedness of an injury within 21 days' notice of its occurrence.[11] Although Section 406.1 contains references to the employee's disability, this Court has held that the acceptance/denial obligation applies regardless of whether the injury is disabling or non-disabling. *See Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 169-70 (Pa. Cmwlth. 2003) (holding that an employer had an obligation to accept or deny workplace injury within 21 days notwithstanding the fact that claimant suffered no loss of wages). However, in order for penalties to be awarded under Section 406.1, the claim petition must be granted. Where the petition is denied, there is no way to calculate penalties. *Brutico v. Workers' Comp. Appeal Bd. (US Airways, Inc.)*, 866 A.2d 1152, 1156 (Pa. Cmwlth. 2004).

In this case, Claimant suffered an injury on January 9, 2019. Employer had an obligation to acknowledge the injury through either an acceptance or denial of

---

[10] Added by the Act of February 8 1972, P.L. 25, *as amended*, 77 P.S. § 991(d)(i).

[11] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

compensability. Claimant is correct that Employer's failure to do so constitutes a violation of Section 406.1. However, since the claim petition was improperly granted, no penalties can be properly awarded in this case.[12]

## IV. Conclusion

Claimant's exposure to carbon monoxide at his workplace on January 9, 2019, was clearly unfortunate. However, the record lacks any evidence that a medical professional ever imposed health-related restrictions on his work duties. Claimant, who is not a medical professional, cannot unilaterally determine that he was totally disabled for four months. We therefore reverse the Board's March 31, 2021 order affirming the WCJ's decision to grant his claim and penalty petitions.

_____
ELLEN CEISLER, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[12] The award of penalties in this case also raises a potential reasoned decision issue. While the WCJ noted that Employer violated the Act, he failed to explain why the specific amount awarded was appropriate. As noted above, the Act provides for penalties of up to 10% in ordinary cases, and up to 50% in excessive or unreasonable ones. To award the absolute maximum penalty warrants an explanation of what made Employer's violation so egregious. The failure to explain that determination justifies Commissioner Zurick's bafflement at the level of penalties in his dissent.

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dunbar Armored and            :
Arch Insurance Company/       :
TPA Gallagher Bassett Services,    :
            Petitioners       :
                                  :
        v.                  :    No. 463 C.D. 2021
                                  :
Zackery Fisher (Workers'       :
Compensation Appeal Board),     :
            Respondent      :

# **O R D E R**

AND NOW, this 4th day of February, 2022, the March 30, 2021 Order of the Workers' Compensation Appeal Board in the above matter is REVERSED.

_____
ELLEN CEISLER, Judge