IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny,                    :
                                        :
                    Petitioner          :
                                        :
        v.                              :   No. 1111 C.D. 2022
                                        :   Submitted: August 9, 2024
Michael Marzano (Workers'               :
Compensation Appeal Board),             :
                                        :
                    Respondent          :


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ELLEN CEISLER, Judge
          HONORABLE MATTHEW S. WOLF, Judge


OPINION BY JUDGE WOJCIK                    FILED:  December 24, 2024

        Allegheny County (Employer) petitions for review of an order of the
Workers' Compensation Appeal Board (Board) insofar as it affirmed the Workers'
Compensation Judge's (WCJ) order granting Michael Marzano's (Claimant) Claim
Petition and denying Employer's Petition to Review Compensation Benefits
(Review Petition) and Petition to Terminate Compensation Benefits (Termination
Petition).  Employer contends that the WCJ erred by determining that Claimant met
his burden of proving ongoing disability related to the work injury and entitlement
to benefits based on a 40-hour work week.  Upon review, we affirm.

## I. Background

        Claimant worked for Employer as a corrections officer at Employer's
jail.  In August 2018, Claimant filed a Claim Petition alleging that on July 27, 2018,

he was attacked by an inmate and sustained physical injuries to his left shoulder, arm, back, neck, and head. Claimant sought ongoing total disability benefits, payment of medical bills, and disfigurement benefits. Claimant amended his Claim Petition to include a psychological component to his work injury. Certified Record (C.R.) at 7-9, 116.[1]

Employer filed a timely answer acknowledging that Claimant suffered a work-related physical injury, which it accepted by issuing a "medical-only" notice of compensation payable (NCP) because Claimant was released to return to work in full-duty capacity three days after the injury. The NCP described the nature of the injury as "multiple lacerations." C.R. at 14. Employer denied ongoing disability and other material allegations in the amended Claim Petition as well as the alleged work-related psychological injury. *Id.* at 14-18, 116.

On March 4, 2019, Employer filed a Review Petition alleging that the nature of the injury should be amended to "superficial laceration to left face/temple; puncture wound to left arm/triceps and lacerations to superior aspect of left shoulder." C.R. at 21. Employer also filed a Termination Petition alleging that Claimant fully recovered from his work injury. *Id.* at 26-29. Thereafter, the WCJ convened hearings. We summarize the relevant testimony and findings.

Claimant testified that he worked for Employer as a corrections officer for approximately 10 years. His job included controlling and restraining inmates. On July 27, 2018, Claimant was performing a random cell search when an inmate attacked him with a shank, which he described as a steel metal piece, 6-to-8 inches long, which had been sharpened on one end. Another inmate joined the attack. Both inmates stabbed him. Claimant testified that he was stabbed in the left triceps, left

---

[1] For ease of reference, the page numbers to the Certified Record reflect electronic pagination.

forehead, back right side of his neck, and twice in his right shoulder blade. A corrections officer and a sergeant came to Claimant's assistance; these officers were later awarded medals of valor for their service relating to the incident. WCJ Opinion, 8/19/21, Finding of Fact (F.F.) No. 6(a).

Claimant further testified that he received emergency medical treatment at Allegheny General Hospital for his injuries the day of the assault. Hospital personnel determined that Claimant was stabbed five times. The shiv penetrated his left triceps by half an inch. Claimant received stitches. Shortly thereafter, Claimant treated with Concentra Medical Centers (Concentra). The doctor at Concentra advised Claimant not to return to work until he saw a psychiatrist. Claimant also saw an orthopedic doctor at Tri-State Orthopedics. F.F. No. 6(b).

Claimant testified that, shortly after the injury, the doctors treating him for his physical injuries released him to return to modified work. On August 20, 2018, Employer offered Claimant the position of employee entrance overseer -- a sedentary duty position at the employee entrance, which involved screening employees entering the jail for contraband without inmate interaction. Although Claimant felt physically capable of returning to work, he did not feel mentally capable, even to the modified position offered. At a later hearing, Claimant acknowledged that his physical problems had fully resolved. F.F. Nos. 6(b), (h)-(i), 7, 8.

Claimant testified that, over the past decade, he has received treatment for preexisting mental health issues, namely, depression and anxiety. In the year preceding the July 27, 2018 work incident, Claimant testified that he was on an Employer-approved leave of absence under the Family and Medical Leave Act

3

(FMLA).[2] Claimant returned to work on July 15, 2018, after receiving a letter from Employer advising him that approved leave of absence under the FMLA or Americans with Disability Act[3] (ADA) would no longer be available because it presented an undue hardship for Employer and that, if Claimant did not return to work, Employer would not be able to retain him as an employee. Upon his return to work on July 15, 2018, Claimant testified he was feeling healthy from a mental health standpoint and that his symptoms were well controlled by medication. However, following the work incident, Claimant testified that his mental health issues were not controlled. Claimant testified he had emotional issues, depression, anxiety, and difficulty sleeping. Claimant has not returned to work. Claimant continues to treat with Ravi Kant, M.D. (Dr. Kant), a psychiatrist, and Kim Kunkel, a psychotherapist, for his mental health conditions. F.F. No. 6(b), (d), (e)-(h), (j).

Claimant further testified regarding a series of other work-related incidents. On October 16, 2009, Claimant was stabbed in the neck and head, and a WCJ awarded disfigurement benefits. On March 31, 2012, Claimant was involved in an incident in which he had blood on his arm; Employer issued a medical-only NCP. On July 29, 2013, Claimant injured his right hand and wrist in an inmate altercation and received benefits pursuant to an NCP, which were later suspended. On January 29, 2014, following an incident with an inmate, Claimant had trouble breathing and went to the hospital. The hospital detected blood clots in his lungs, and Employer issued a notice of denial. On October 21, 2015, Claimant injured his right hand in an inmate altercation. On May 29, 2016, Claimant injured

---

[2] 29 U.S.C. §§2611-2620, 2631-2636, and 2651-2654.

[3] 42 U.S.C. §§12101-12213.

4

his left hand while restraining an inmate; Employer issued a medical-only NCP. F.F. No. 6(c).

On cross-examination, Claimant testified that when Employer asked him to return to work after the injury, he responded: "It's only been –been six days since – I mean, I almost got killed." F.F. No. 6(h); C.R. at 136. Claimant admitted he harbored uncontrolled rage towards the administration, the union, and his coworkers because they did not check in on him after the incident and showed little regard for his wellbeing despite the severity of the incident. C.R. at 209; *see* F.F. No. 11(i). Claimant acknowledged telling Employer's independent medical examiner, Burton Singerman, M.D. (Dr. Singerman), that he might not be able to control himself and felt capable of attacking and possibly killing one of those individuals. F.F. No. 8; C.R. at 209-210.

Dr. Kant, who is board certified in psychiatry, testified that his office has been treating Claimant since 2015 for depression. Dr. Kant testified that he did not take Claimant out of work between 2015 and July 2018 or hospitalize him for mental health issues. Dr. Kant testified that his office treated Claimant for mental health issues three days after the assault. F.F. No. 9(a)-(b).

Dr. Kant opined that the stabbing incident aggravated Claimant's preexisting major depression and anxiety and caused post-traumatic stress disorder (PTSD). Dr. Kant noted Claimant was stabbed repeatedly and felt that he was going to die. C.R. at 510. Dr. Kant testified that Claimant was having emotional distress, flashbacks of the incident, recurring nightmares, anxiety, and anger. Claimant "was angry over the incident that happened to him, the stabbing incident." C.R. at 505. He felt scared, had difficulty coping, and could not imagine going back into the jail building after the incident. Between the date of the incident to June 2019, Dr. Kant's

5

office made multiple changes to Claimant's medications to target his increased symptoms. F.F. No. 9(d).

Dr. Kant testified that, after the work incident, he instructed Claimant not to return to work because of the serious increase in his symptoms. Dr. Kant opined that Claimant was disabled from his preinjury job and similar work because of his mental health issues from July 27, 2018, until September 1, 2019. By September 1, 2019, Dr. Kant testified that Claimant was doing well and could return to his preinjury job without any restrictions from a psychiatric standpoint. He testified that Claimant was fully recovered from his PTSD and work-related exacerbation of symptoms. He testified that Claimant still had "ongoing residuals of his preexisting condition which is the depression and anxiety," C.R. at 543. F.F. No. 9(e)-(i).

Although Dr. Kant did not believe that Claimant was a threat to others or himself during this period, on cross-examination, he admitted he never explored Claimant's anger issues. Dr. Kant was not aware that Claimant felt anger directed towards his coworkers, jail administration, or union to the point of harming someone. Dr. Kant testified that type of rage and upset "would not be due to an underlying psychological condition," but "a rage reaction based upon that traumatic event itself." C.R. at 536. Dr. Kant testified that, if one of his patients expressed thoughts of harming or attacking people who showed a lack of concern for him, the patient would not be fit to return to work. F.F. No. 9(p); C.R. at 536-38.

In opposition to Claimant's Claim Petition and in support of its Termination and Review Petitions, Employer presented the deposition testimony of medical experts, Robert Waltrip, M.D. (Dr. Waltrip) and Dr. Singerman, and its Deputy Warden of Operations, Jason Beasom (Deputy Warden).

6

Dr. Waltrip, a board-certified orthopedic surgeon, testified regarding Claimant's physical injuries. Dr. Waltrip evaluated Claimant on January 8, 2019, and obtained a history of the work incident and Claimant's treatment. Dr. Waltrip testified that Claimant had a four-centimeter healed laceration to the left side of the face and temple region, a puncture wound to the left arm and possible left triceps muscle. He opined that Claimant fully recovered from his physical injuries and did not require any ongoing medical treatment, restrictions, or limitations. He opined that by early August 2018, Claimant was capable of performing the employee entrance overseer position. On cross-examination, Dr. Waltrip testified that patients, after any type of physical injury can have a psychiatric overlay, which would be more common in people with a psychiatric history. Dr. Waltrip testified that one of the reasons that Claimant did not want to return to work was the lack of support he felt from Employer. F.F. No. 10(a)-(f).

Dr. Singerman, a board-certified psychiatrist, testified regarding Claimant's mental injuries. Dr. Singerman evaluated Claimant on December 14, 2018, and again on June 12, 2020. At the first evaluation, he obtained a history of the July 27, 2018 work incident and reviewed Claimant's mental health records and history of past assaults. Dr. Singerman noted that Claimant missed the majority of work for over the three-year period preceding the July 27, 2018 incident based on FMLA leave for anxiety and depression and hernia surgery. He noted that, since 2015, Claimant has been treated for major depression and anxiety. F.F. No. 11(a)-(g).

Dr. Singerman testified that Claimant was upset that no one from Employer or his union had contacted him after the stabbing. Claimant was enraged and felt a sense of betrayal and abandonment. Claimant relayed that he did not

7

accept the modified position because he feared that, if he took the job, he might become so enraged at seeing certain employees that he would not be able to hold himself back from harming or killing one of them. Dr. Singerman indicated that Claimant had no capacity to control his rage and displayed the same sense of rage in other areas of his life. Dr. Singerman related Claimant's difficulties to his longstanding psychological problems exacerbated by his sense of abandonment and lack of support following the incident. He opined that the assault itself did not cause Claimant's psychological problems. F.F. No. 11(h)-(j).

Dr. Singerman initially diagnosed Claimant with acute stress disorder, even though he did not fit the criteria. F.F. No. 11(n); C.R. at 1113. He later changed the diagnosis to adjustment disorder and abandonment rage. F.F. No. 11(n); C.R. at 1114, 1119. Dr. Singerman opined that Claimant's condition was not caused by or related to the assault but rather to his sense of abandonment from his coworkers, the administration, and the union because they did not support him following the incident. He described Claimant's rage as "enormous." C.R. at 1115. He recommended a mood stabilizer to manage Claimant's rage. He did not find that Claimant had any lingering psychiatric issues as a result of the assault itself. F.F. No. 11(l)-(n).

Dr. Singerman suggested that Claimant should find another line of work through vocational training. Dr. Singerman testified that Claimant's abandonment rage precluded him from being able to work in a modified capacity within a week from the injury. F.F. No. 11(r), (v).

Following his initial evaluation, Dr. Singerman testified that he spoke with Claimant's therapist, Ms. Kunkel, at length, with Claimant's permission. Ms. Kunkel relayed that she observed mood lability, passive suicidal thoughts, and

8

potential homicidal tendencies in Claimant. Both Dr. Singerman and Ms. Kunkel agreed that, based on his level of anger, Claimant should not return to Employer's jail based on the clear danger it would represent to Claimant's coworkers and superiors. F.F. No. 11(k).

At the second evaluation on June 12, 2020, Dr. Singerman examined Claimant's fitness for duty and reviewed the testimony of Claimant and Dr. Kant. Dr. Singerman testified that Claimant had "impressively improved"; there was no rage or severe anxiety; and Claimant was more capable of controlling his emotions. F.F. No. 11(v), (aa)-(dd); C.R. at 1129.

Dr. Singerman disagreed with Dr. Kant's diagnosis of PTSD from the work incident because Claimant did not present with it. Dr. Singerman ultimately diagnosed Claimant with aggravated or exacerbated depression, and anxiety or major depressive disorder, which he again related to the aftermath of the assault -- the feeling of abandonment -- not the assault itself. On cross examination, Dr. Singerman acknowledged that the work incident was a "substantial contributing factor" to the development of Claimant's problems. F.F. No. 11(jj); C.R. at 1148.

Dr. Singerman testified that Claimant expressed his desire to return to work following a staff turnover at the jail. Dr. Singerman testified that Claimant could return to modified work in light of the employee turnover because Claimant was not enraged with the new staff. However, Dr. Singerman advised that the modified position should have limited interaction with inmates. F.F. No. 11(y), (dd).

Deputy Warden testified regarding Claimant's pay and work history based on various payroll and attendance reports between 2013 and 2018. A Kronos payroll tracking system printout, for the period between January 5, 2014, and November 26, 2018, documented the times Claimant had worked. A Time and Pay

9

History Detail showed hours Claimant worked and the pay received from December 23, 2013, through November 10, 2018. A Payroll Attendance Record for 2014 through 2017 showed days used for ADA and FMLA as unpaid "dock" status. F.F. No. 12(a)-(b).

Deputy Warden testified that in June 2018, Employer sent a letter to Claimant informing him that his absence was an undue hardship for Employer, and Claimant needed to return to work by June 15, 2018, or face termination. Claimant returned to work on Sunday, July 15, 2018, for the 7:00 a.m. to 3:00 p.m. shift. He worked the same shift on July 21, 2018. He next returned on July 27, 2018, for the 6:00 a.m. to 3:00 p.m. shift. In the year leading up to the work incident, Claimant worked a total of 10 days; the remainder of the time he was on FMLA leave. F.F. No. 12(c)-(d).

Deputy Warden further testified that, shortly after the incident, Claimant was released to return to work with modified restrictions. Claimant refused to go back to work until he saw a psychiatrist. On August 10, 2018, Employer sent Claimant a letter offering him a modified position of employee entrance overseer and requesting that he return on August 20, 2018, for the 7:00 a.m. to 3:00 p.m. shift, with Tuesday and Wednesday to remain as days off, at an hourly rate of $33.59, which was determined by the parties' collective bargaining agreement (CBA) and seniority. Deputy Warden testified that the employee entrance overseer position was a light-duty position that did not involve interaction with inmates. F.F. No. 12(f), (g).

Deputy Warden indicated that, at some point, Employer received documentation that Claimant was released to return to work without restriction from a psychiatric perspective. In a letter to counsel dated December 6, 2019, Employer

10

expressed concerns about the statements Claimant made to Dr. Singerman, which called into question whether Claimant posed a danger to himself or others should he return to work. At the time of the deposition, Deputy Warden testified it was his understanding that Claimant is physically able to return to work pending a fit-for-duty review regarding his psychological state. Although Employer never rescinded the modified-duty job offer of employee entrance overseer, Employer had reservations about bringing Claimant back in light of statements he made to Dr. Singerman. Deputy Warden testified that a fitness-for-duty examination was scheduled to take place two days from the date of his testimony (July 31, 2020). Claimant has not returned to work but remains an active employee of the jail. F.F. No. 12(h)-(j).

The WCJ accepted Claimant's testimony as to the July 27, 2018 incident and his injuries. The WCJ accepted Claimant's testimony that he was disabled from performing his preinjury job as of July 27, 2018. She found that from a physical standpoint, Claimant credibly testified that he could have performed the modified job offered in August 2018 and, by October 2018, he could have performed his preinjury job. However, the WCJ accepted his testimony that, from a psychological standpoint, he could not perform the modified job when it was offered and remains incapable of performing his preinjury position. She found that Claimant's "persuasiveness and credibility were bolstered further by portions of the testimony and opinions of Dr. Kant, Dr. Waltrip and Dr. Singerman," which she found to be "persuasive and credible, in part." F.F. No. 15.

The WCJ partially accepted the testimony of Dr. Kant that Claimant sustained work-related PTSD and an exacerbation and increase in symptoms of preexisting anxiety and depression. She accepted Dr. Kant's testimony that

11

Claimant was disabled from his preinjury job and from the modified-duty job offered until September 1, 2019, when he released Claimant to full duty. The WCJ accepted Dr. Waltrip's testimony regarding Claimant's physical injuries and his full recovery from those injuries. The WCJ accepted Dr. Singerman's testimony that Claimant's increased symptomology after the July 27, 2018 work assault precluded Claimant from accepting the modified position when it was offered and from returning to his preinjury position. The WCJ rejected Dr. Singerman's opinion that Claimant's psychological and emotional reaction was not caused by the stabbing incident itself. She relied on the portion of his testimony that the stabbing incident was a substantial contributing factor of Claimant's adverse symptoms and reactions. F.F. Nos. 16-18.

The WCJ further found that, taken as a whole, the opinions of Drs. Kant, Waltrip, and Singerman supported a finding that Claimant had an adverse psychological reaction to the physical stabbing trauma from the July 27, 2018 work incident. Although Dr. Kant testified that Claimant was capable of returning to his preinjury job as of September 1, 2019, she relied on Dr. Singerman's testimony that Claimant could only return to modified work with limited inmate interaction. Employer, having expressed concerns regarding Claimant's mental health and requiring a fitness-for-duty evaluation, has not offered Claimant modified work. F.F. No. 18.

The WCJ further found that when Claimant was called back to work in June 2018, he had a reasonable expectation, based on the CBA, that he would be paid $33.59 an hour for a 40-hour week. She found that the wages earned by Claimant in the year prior to the work injury, a period where he took employer-approved FMLA leave, to be a gross underestimate of Claimant's true earning

12

capacity. Thus, she calculated Claimant's average weekly wage (AWW) to be $1,343.60 with a corresponding compensation rate of $895.64. F.F. No. 19.

Based on these findings, the WCJ concluded that Claimant met his burden of proving that, on July 27, 2018, he sustained multiple contusions and stab wounds to the left triceps, left facial/head area, right neck, and right shoulder blade. She also concluded that Claimant established that, as a result of the traumatic physical altercation and stab wounds, he suffered from PTSD and aggravation/exacerbation of preexisting anxiety, depression, and personality disorder, causing an increase in symptoms including anger, rage, and a loss of emotional control. The WCJ determined that Claimant has been disabled since the date of injury and remains incapable of performing his time of injury position as a corrections officer due to the work injuries. The WCJ also concluded that Claimant sustained a work-related disfigurement and awarded him 13 weeks of disfigurement benefits. The WCJ determined that Employer did not carry its burdens of proof on its Review and Termination Petitions. By decision and order dated August 19, 2021, the WCJ granted Claimant's Claim Petition and denied Employer's Review and Termination Petitions. Employer appealed to the Board, which reversed the WCJ's award of disfigurement benefits but affirmed in all other respects. This appeal now follows.[4, 5]

---

[4] Our review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether the necessary findings of fact were supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704; *Milner v. Workers' Compensation Appeal Board (Main Line Endoscopy Center)*, 995 A.2d 492, 495 n.2 (Pa. Cmwlth. 2010).

[5] Claimant did not challenge the Board's reversal of the disfigurement award and filed a notice of non-participation in this appeal.

13

## II. Issues

Employer contends that the WCJ's decision was not well reasoned or supported by substantial evidence and that the WCJ misapplied the law. Employer claims a subsequent incident following the work injury led to Claimant developing other psychological issues, which should not be found to be part of Claimant's work injury. Employer contends the WCJ erred by not granting its Termination Petition because substantial evidence does not support a finding of ongoing disability where Claimant fully recovered from his physical injuries and both Claimant's and Employer's mental health experts agreed that Claimant was capable of returning to work taking into account his psychological condition. Employer asserts that the WCJ erred in determining that Claimant had an AWW based upon 40 hours of work per week where Claimant never testified that he had an expectation of working 40 hours per week and had not done so in the year leading up to his work injury.[6]

## III. Discussion
### A. Reasoned Decision

First, Employer contends the WCJ's decision is not reasoned because the WCJ adopted the proposed findings advanced by Claimant. Although Claimant was clearly assaulted at work and suffered an injury, Employer asserts that this does not mean that Claimant should prevail on all issues that are disputed, which must be

---

[6] Employer's argument is not divided into sections to separately address the questions raised. *See* Pa.R.A.P. 2119(a). Except for one reference appearing on page 30 of its brief, Employer's argument section does not include references to the Certified Record, which contains 1212 pages, or the Reproduced Record, which contains 485 pages, in support of its claims that the WCJ's findings are not supported by substantial evidence. *See* Pa.R.A.P. 2101, 2119(c), 2132. We caution Employer that this Court will not act as counsel or develop arguments on its behalf. *Commonwealth v. Le*, 208 A.3d 960, 976 n.17 (Pa. 2019); *see also Commonwealth v. Spotz*, 18 A.3d 244, 262 n.9 (Pa. 2011) (if a deficient brief hinders this Court's ability to address any issue on review, we may consider the issue waived).

individually evaluated and decided. The WCJ's adopted findings are not based upon substantial evidence.

"[I]t is a fundamental tenet of workers' compensation law that the WCJ, as fact[]finder, has complete authority over questions of witness credibility and evidentiary weight." *Sicilia v. API Roofers Advantage Program (Workers' Compensation Appeal Board)*, 318 A.3d 803, 824 (Pa. 2024) (citation and quotation omitted). "As the ultimate fact[]finder, the WCJ has exclusive province over questions of credibility and evidentiary weight and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *Id.* (citation and quotation omitted).

"[T]he appellate role is not to reweigh the evidence or to review the credibility of the witnesses." *Bethenergy Mines, Inc. v. Workmen's Compensation Appeal Board (Skirpan)*, 612 A.2d 434, 437 (Pa. 1992). "We are bound by the WCJ's credibility determinations." *A & J Builders, Inc. v. Workers' Compensation Appeal Board (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013). "Moreover, it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Id.* "We examine the entire record to see if it contains evidence a reasonable person might find sufficient to support the WCJ's findings."

To satisfy the reasoned decision requirements of Section 422(a) of the Workers' Compensation Act (Act),[7] a WCJ must set forth the rationale for the decision by specifying the evidence relied upon and reasons for accepting it. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1047 (Pa. 2003); *A & J Builders*, 78 A.3d at 1243. "Where medical experts testify by

---

[7] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §834.

15

deposition, a WCJ's resolution of conflicting evidence must be supported by more than a statement that one expert is deemed more credible than another." *A & J Builders*, 78 A.3d at 1243 (citation and quotation omitted). To allow effective appellate review, the WCJ must articulate an objective basis for the credibility determination. *Id.* "However, Section 422(a) does not permit a party to second-guess the WCJ's reasons for credibility determinations." *Id.* (citation and quotation omitted).

Here, in accordance with the reasoned decision requirements of Section 422(a) of the Act, the WCJ reviewed the evidence presented by both parties and issued a 31-page opinion, wherein she summarized the evidence presented and made necessary findings and credibility determinations. The WCJ credited the testimony of Claimant and the uncontradicted medical testimony of Dr. Waltrip. She also credited the testimony of Dr. Kant and Dr. Singerman in part. From Dr. Kant, she accepted that Claimant sustained a work-related psychological injury as a result of the physical trauma, but she rejected his opinion that Claimant could return to his preinjury job as of September 1, 2019. She relied on Dr. Singerman's testimony that Claimant had not fully recovered and could only return to modified work. Although Dr. Singerman did not believe that Claimant's ongoing symptoms were related to the work assault, she rejected that portion of testimony because Dr. Singerman also testified that the assault had substantially contributed to Claimant's psychological and emotional reaction to the event.

The WCJ summarized the testimony presented and explained what testimony she accepted and why. The fact that the WCJ adopted the proposed findings offered by Claimant does not mean that she did not individually evaluate

16

and decide all issues raised in disposing of the parties' petitions. Upon review, the WCJ fully satisfied the reasoned decision requirements of the Act.

## B. Ongoing Disability

Next, Employer contends that substantial evidence does not support a finding of ongoing disability related to the work injury and Employer is entitled to a termination of benefits as a matter of law. As to Claimant's mental injury, Employer argues that Claimant's own expert, Dr. Kant, specifically opined that Claimant had fully recovered from his PTSD and was capable of returning to his preinjury job as of September 1, 2019, from a mental standpoint. There is no evidence supporting ongoing disability due to psychological conditions arising from the work-related assault and injuries beyond this date. Dr. Singerman repeatedly testified that Claimant's mental health issues and ongoing disability were caused by a separate unrelated event -- the feeling of abandonment he experienced after the assault -- not the assault itself. As such, the WCJ should have examined Claimant's ongoing mental health claims under the mental-mental burden of proof.

As to Claimant's physical injuries, Employer argues that its medical expert, Dr. Waltrip, was the only expert to testify regarding Claimant's physical injuries. Dr. Waltrip credibly testified that Claimant had fully recovered from his physical injuries shortly after the incident. Even Claimant conceded that he was fully recovered from his physical injuries. At the very least, the WCJ should have granted a partial termination with respect to Claimant's physical injuries. To conclude otherwise places Employer in the untenable position of having to incur costs to obtain an updated independent medical evaluation to address the physical injury in the event of subsequent litigation.

17

Section 413 of the Act, 77 P.S. §772, provides that "[a] [WCJ] . . . may, at any time, modify, reinstate, suspend, or terminate a [NCP] . . . upon petition filed by either party with the [Department of Labor and Industry], upon proof that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased."

With respect to a claim petition, the claimant bears the initial burden of proving that his injury arose in the course of employment and was related thereto. *Wachs v. Workers' Compensation Appeal Board (American Office Systems)*, 884 A.2d 858, 862 (Pa. 2005). Generally, if there is no obvious relationship between the injury and the work-related cause, unequivocal medical testimony is required to meet this burden of proof. *Fotta v. Workmen's Compensation Appeal Board (U.S. Steel)*, 626 A.2d 1144, 1146 (Pa. 1993); *A & J Builders*, 78 A.3d at 1242. The medical witness must testify that, in his or her professional opinion, the injury was caused by the work incident. *Lewis v. Workmen's Compensation Appeal Board (Pittsburgh Board of Education)*, 498 A.2d 800, 802 (Pa. 1985). The claimant also has the burden of proving disability as a result of the work-related injury. *BJ's Wholesale Club v. Workers' Compensation Appeal Board (Pearson)*, 43 A.3d 559, 562-63 (Pa. Cmwlth. 2012). "Disability" refers to the loss of earning power, whether total or partial, attributable to the work-related injury. *Landmark Constructors, Inc. v. Workers' Compensation Appeal Board (Costello)*, 747 A.2d 850, 854 (Pa. 2000).

Where the asserted injury is a mental injury, it must fall into one of three categories: "[(1)] mental-mental, whereby a mental or psychic condition is caused by a psychic stimulus; [(2)] mental-physical, whereby a psychic injury manifests itself in some physical form; and [(3)] physical-mental, whereby a

18

physical injury results in psychic distress." *Payes v. Workers' Compensation Appeal Board (Pennsylvania State Police)*, 79 A.3d 543, 550 (Pa. 2013); *accord Murphy v. Workers' Compensation Appeal Board (Ace Check Cashing Inc.)*, 110 A.3d 227, 234 (Pa. Cmwlth. 2015).

To establish a claim under the physical-mental standard, the claimant must establish that the mental injury resulted from "a triggering physical stimulus" and arose during the course of employment. *Murphy*, 110 A.3d at 234. "Physical stimulus" refers to "a physical injury that requires medical treatment, even if that physical injury is not disabling under the [Act]." *Id.*

In other words, a claimant must prove that a physical work injury requiring medical treatment caused a psychological injury. *Murphy*, 110 A.3d at 234. However, "[a] claimant need not prove that he . . . suffered a physical disability that caused a mental disability for which he . . . may receive benefits[; n]or must a claimant show that the physical injury continues during the life of the [mental] disability." *Id.* (citation and quotation omitted). Although the physical injury itself is not required to be disabling under the Act, its presence or lack thereof, and its relationship to the mental injury, is determinative of whether the physical-mental standard applies. *Murphy*, 110 A.3d at 237. In physical-mental claims, when there is more than one causative agent in the injury or disability acknowledged, "the substantial contributing factor test applies." *Morris v. Workers' Compensation Appeal Board (Ball Corp.)* (Pa. Cmwlth., No. 1172 C.D. 2014, filed June 11, 2015) (quoting 6 David B. Torrey & Andrew E. Greenberg, Workers' Compensation Law and Practice §4:21 (3d ed. 2008)).[8]

---

[8] Unreported memorandum opinions of this Court filed after January 15, 2008, may be cited for their persuasive value pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate **(Footnote continued on next page…)**

19

The occurrence of a physical injury does not always result in application of the physical-mental standard. For example, in *Ryan v. Workm[e]n's Compensation Appeal Board (Community Health Services)*, 707 A.2d 1130, 1131 (Pa. 1998), a claimant who was involved in a work-related automobile accident later suffered a psychological injury upon learning that she was being sued by the driver of the other vehicle in the accident. The Supreme Court determined that the triggering event of the psychological injury was the lawsuit, not the "physical stimulus in the form of the injuries [the c]laimant suffered from the work-related accident." *Id.* at 1135. "The accident itself was only indirectly causally related to [the c]laimant's psychological injury since, without the accident, there would not have been the lawsuit to trigger or stimulate the psychological injury." *Id.* Consequently, the physical-mental standard did not apply. *Id.*; *see Gulick v. Workers' Compensation Appeal Board (Pepsi Cola Operating Co.)*, 711 A.2d 585, 588-89 (Pa. Cmwlth. 1998) (rejecting application of the physical-mental standard where the evidence showed that the claimant's mental illness was not caused by or aggravated by his physical injury, but by the employer filing a termination petition).

Once an injury is established, an employer seeking to terminate benefits must prove "that the claimant [is] fully recovered from his work injury and has no remaining disability, or that any remaining disability is no longer related to the work injury." *Ingrassia v. Workers' Compensation Appeal Board (Universal Health Services, Inc.*, 126 A.3d 394, 402 n.13 (Pa. Cmwlth. 2015). An employer meets this

---

Procedure, Pa. R.A.P. 126(b), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

20

burden when its medical expert unequivocally[9] testifies, "within a reasonable degree of medical certainty, that the claimant is fully recovered [and] can return to work without restrictions[,] and that there are no objective medical findings which either substantiate the claims of pain or connect them to the work injury." *Udvari v. Workmen's Compensation Appeal Board (USAir, Inc.)*, 705 A.2d 1290, 1293 (Pa. 1997).

An employer is entitled to terminate benefits only when it demonstrates that the claimant is fully recovered from the work-related injury and all disability related to the injury has resolved. *Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.)*, 919 A.2d 922, 926 (Pa. 2007). "A partial grant of a termination petition is improper, as a termination requires that *all* disability has ceased." *Pocono Mountain School District v. Kojeszewski (Workers' Compensation Appeal Board)*, 280 A.3d 12, 18 (Pa. Cmwlth. 2022) (emphasis added) (citing *Mitoulis v. Workers' Compensation Appeal Board (Sunrise Senior Living Management, Inc.)* (Pa. Cmwlth., No. 991 C.D. 2018, filed April 27, 2020)). A WCJ's unchallenged finding of full recovery from a discrete injury is binding in future proceedings and is sufficient to relieve the employer of liability for related medical expenses. *Mino v. Workers' Compensation Appeal Board (Crime Prevention Association)*, 990 A.2d 832, 839 (Pa. Cmwlth. 2010); *Temple University Hospital v. Workers' Compensation Appeal Board (Sinnott)*, 866 A.2d 489, 495 n.4 (Pa. Cmwlth. 2005); *see Mitoulis*, slip op. at 6. Where a claimant is not fully

---

[9] "Medical testimony will be found unequivocal if the medical expert, after providing a foundation, testifies that in his professional opinion that he believes a certain fact or condition exists." *Coyne v. Workers' Compensation Appeal Board (Villanova University and PMA Group)*, 942 A.2d 939, 955 (Pa. Cmwlth. 2008). "[T]estimony is equivocal if it is vague, leaves doubt, is less than positive or is based upon possibilities." *Miller v. Workers' Compensation Appeal Board (Peoplease Corp., Arch Insurance Co. and Gallagher Bassett Services)*, 29 A.3d 869, 871 (Pa. Cmwlth. 2011).

recovered but is able to return to a modified position, an employer is obligated to show that a suitable position has been made available. *Landmark*, 747 A.2d at 854.

Here, there is no dispute that Claimant sustained a physical injury from the stabbing assault requiring medical treatment. Employer accepted liability for the physical injury by issuing a medical-only NCP, which was described as "multiple lacerations" to multiple body parts. C.R. at 14. Although Claimant alleged unspecified "injuries to [his] left shoulder, back, neck, arm[,] and head," C.R. at 7, Claimant offered no medical evidence expanding the nature of the physical injuries sustained beyond the described lacerations. As to the ongoing nature of the physical injury, Dr. Waltrip's and Claimant's credited testimony established that Claimant had fully recovered from his physical injuries. Dr. Waltrip testified that Claimant could return to modified work in August 2018 and to his preinjury job as of October 2018 from a physical standpoint. Claimant conceded he was fully recovered from his physical injuries.

With regard to the mental injury, Employer did not recognize this injury. The initial burden remained on Claimant to establish a mental work injury and ongoing loss of earning power related thereto. Claimant asserted a physical-mental injury. Dr. Kant credibly testified that the physical trauma of the work incident aggravated Claimant's preexisting major depression and anxiety and caused PTSD. C.R. at 501-02. Dr. Kant stated that part of the PTSD is an aggravation of depression and anxiety. He continued:

> PTSD is when someone is exposed to traumatic event which is not in the normal daily life and that has emotional impact on the person. And the person having multiple symptoms which can include severe anxiety, panic attack, flashbacks, nightmares, inability to sleep, not able to relax, being hyper vigilant, very reactive and many other

22

symptoms. Because of those -- these are the symptoms triggered by that traumatic event for that person.

*Id*. at 501. Dr. Kant indicated that his office made changes to Claimant's medications to target his increased depression, anxiety, and PTSD symptoms. *Id.* at 502-03. He testified that, after the work incident, Claimant could not go back to the jail because of the serious increase in his symptoms. *Id.* at 503. Dr. Kant testified that Claimant was disabled as a result of the mental injury from the date of the assault until September 1, 2019. *Id.* at 508. As of that date, Dr. Kant believed that Claimant had recovered from the work-related psychological issues because Claimant was doing well. *Id.* Dr. Kant believed Claimant could return to his preinjury job. *Id.* He was of the opinion that any ongoing issues were due to his preexisting conditions, which did not preclude him from working. *Id.*

As for Claimant's rage symptoms, Dr. Kant did not explore this issue with Claimant. *Id.* at 536. When asked whether rage is a separate underlying psychological condition, he disagreed explaining: "You can't conclude that people who have rage only because they have some underlying psychological problems[,] and they will not have a rage reaction based upon that traumatic event itself." *Id.* at 536. Dr. Kant testified that if a patient told him he was having thoughts of harming or killing his coworkers, the patient "would not be fit to return to work." *Id.* at 538. He testified that such homicidal rage would be an out of proportion psychological reaction to a lack of people showing concern for him as suggested by Dr. Singerman. *Id.* at 537.

Dr. Singerman similarly diagnosed Claimant with an aggravation or exacerbation of his preexisting depression, anxiety, or major depressive disorder. C.R. at 1140. Dr. Singerman also diagnosed Claimant with "abandonment rage." C.R. at 1119. However, Dr. Singerman related these symptoms to the aftermath of

the assault -- the feeling of abandonment -- not the assault itself. *Id.* at 1140, 1147-48.

Dr. Singerman disagreed with Dr. Kant's assessment that Claimant could return to work without restrictions. On June 12, 2020, Dr. Singerman testified that, although Claimant was improved and more capable of controlling his emotions, he should not return to his preinjury job. *Id.* at 1116, 1134-35. Dr. Singerman testified that Claimant should have minimal interaction with inmates. *Id.* at 1116, 1137, 1142, 1150.

In addition, Deputy Warden expressed concerns about Claimant being a danger to himself or others. Even though Dr. Singerman opined that Claimant could work in modified duty as a corrections officer with limited inmate interaction, Deputy Warden testified Claimant was not permitted to return to work until he passed a fit-for-duty examination, which was scheduled two days after his deposition.

The WCJ was free to accept in whole or in part expert medical testimony. Based on Dr. Kant's and Dr. Singerman's testimony, the WCJ found that Claimant suffered from PTSD and an aggravation/exacerbation of preexisting anxiety, depression, and personality disorder, which caused an increase in symptoms including anger, rage, and loss of emotional control. The WCJ credited Dr. Kant's testimony that the physical trauma sustained in the stabbing assault triggered Claimant's mental health conditions. Although Dr. Singerman did not relate any of Claimant's symptomology to his physical injuries, the WCJ found that, on cross-examination, Dr. Singerman acknowledged that the assault was a substantial contributing factor to the development of Claimant's problems. F.F. No. 11(jj); C.R. at 1148. When asked, if the work incident did not occur would Claimant have

24

exhibited the same amount and the same type of symptoms, Dr. Singerman testified most likely not and agreed that the assault "li[t] the fuse." C.R. at 1157, 1160. Dr. Singerman testified that "[t]he assault led to . . . his sense of abandonment . . . ." C.R. at 1118. "That wouldn't have happened if he hadn't had some assault." *Id.* at 1160-61.

As to whether the disability is ongoing, the WCJ did not credit Dr. Kant's testimony regarding Claimant's ability to return to his preinjury job as of September 1, 2019. She instead relied upon Dr. Singerman's testimony that Claimant could only return to modified work with minimal inmate interaction due to ongoing symptoms. Employer has not made such a position available.

Upon consideration of the evidence as a whole, substantial evidence supports the WCJ's finding that the physical assault in which Claimant was stabbed multiple times by two inmates triggered Claimant's PTSD and an exacerbation of his preexisting depression and anxiety disorder and was a substantial contributing factor to Claimant's ongoing mental health symptoms. Thus, the WCJ properly analyzed Claimant's disability claim under the physical-mental burden of proof. In the absence of an offer for modified work, the WCJ did not err in concluding that Claimant still has ongoing loss of earnings attributable to the work-related injury.

As for Employer's claim that it is entitled to a partial termination of benefits based on Claimant's physical recovery, the law only permits a termination of benefits when all disability has ceased. *See Lewis*, 919 A.2d at 926; *Pocono Mountain*, 280 A.3d at 18. Employer's contention that it will remain liable for Claimant's medical treatment unless a "partial termination" is granted is unfounded. *See Mino*, 990 A.2d at 839; *Temple University Hospital*, 866 A.2d at 494 n.4. The WCJ's unchallenged finding that Claimant fully recovered from his physical injuries

is sufficient, alone, to relieve Employer of the obligation to pay for treatment related to that discrete injury. Thus, we conclude that the WCJ did not err by denying Employer's Termination Petition.

## C. Average Weekly Wage

Lastly, Employer contends that the WCJ erred in calculating Claimant's AWW based upon an expected 40-hour work week when there is no evidence supporting this determination. Claimant did not work consistently for the last three years. Since April of 2015, Claimant has not worked a 40-hour week. There were instances where the Claimant worked 32 hours in a week, but not 40. In the year preceding the work injury, Claimant worked a total of 10 days. Thus, Employer argues that substantial evidence does not support a finding that Claimant had a reasonable expectation of working 40 hours per week.

Section 309 of the Act governs the calculation of a claimant's "wages" for purposes of determining the appropriate amount of workers' compensation benefits to which he is entitled and construes the term "wages" as the AWW of the claimant calculated in accordance with subsection 309(a) through (e). 77 P.S. §582. Specifically, Section 309 of the Act provides, in relevant part:

> (d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the [AWW] shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.
>
> (d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately

26

preceding the injury, the [AWW] shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the [AWW] shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

77 P.S. §582(d)-(d.2).

Where, as here, a claimant "has worked less than a complete period of thirteen calendar weeks" prior to sustaining the work injury "and does not have fixed weekly wages, the [AWW] shall be the hourly wage rate multiplied by the number of hours the employe *was expected to work per week under the terms of employment*." 77 P.S. §582(d.2) (emphasis added). Section 309(d.2) does not contain a look-back period but, rather, "provides for a prospective calculation of potential earnings." *Reifsnyder v. Workers' Compensation Appeal Board (Dana Corporation)*, 883 A.2d 537, 546 (Pa. 2005).

Section 309 reflects "the General Assembly's intention that the baseline figure from which benefits are calculated should reasonably reflect the economic reality of a claimant's recent pre[]injury earning experience, with some benefit of the doubt to be afforded to the claimant in the assessment." *Triangle Building Center v. Workers' Compensation Appeal Board (Linch)*, 746 A.2d 1108, 1112 (Pa. 2000); *accord Reifsnyder*, 883 A.2d at 545, 548. Our Supreme Court examined the proper calculation of a claimant's AWW in two cases, which are instructive here.

First, in *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.)*, 834 A.2d 524, 533 (Pa. 2003), the Supreme Court determined that the

27

diminished wages the claimant had earned as a part-time student worker were not to be included in calculating his AWW where his disabling work injury occurred after he had graduated from high school. The claimant had been working for three months as a full-time employee with the expectation he would continue to work full time. The Supreme Court concluded that to include the part-time wages in the calculation would not be an accurate assessment of his earning capacity. *Id.* at 534.

Then, in *Colpetzer v. Workers' Compensation Appeal Board (Standard Steel)*, 870 A.2d 875 (Pa. 2005), the Supreme Court examined the situation where the injured claimants had received no wages during relevant periods in the prior year because they were on disability as a result of prior compensated work injuries. The Supreme Court held that an accurate calculation of AWW required that the periods of prior disability not be treated as if the claimants had no earning capacity at that time. Rather, the Court ruled that the AWW previously established for the prior work injuries was the proper measure of the AWW. In so holding, the Court reasoned "[i]t is not an accurate measure of economic reality to treat periods where no wages were earned solely because the worker was unfortunate enough to have suffered a previous work injury, as if the worker had no earning capacity for those periods." *Id.* at 886. Further, it stated "the Act was not designed to punish the worker merely because a work calamity befell him." *Id.* at 887.

Here, Claimant was a long-term employee having worked for Employer over the course of 10 years. C.R. at 121. Claimant maintained a continuing employment relationship with Employer pursuant to the terms of a CBA even when he was not working because of past work-related disabilities or FMLA leave. In the year leading up to the work incident, Claimant was on FMLA leave, which Employer

approved. As a result, Claimant only worked a total of 10 days that year.[10]  *Id.* at 926.  Because Claimant worked less than a complete period of thirteen calendar weeks as of the date of the injury, Section 309(d.2) applied.  *See Mixter v. Workers' Compensation Appeal Board (Lowe's Home Centers, Inc.)* (Pa. Cmwlth., No. 1387 C.D. 2010, filed December 21, 2010); *ABB C-E Services, Inc. v. Workers' Compensation Appeal Board (Rushing)* (Pa. Cmwlth., No. 24 C.D. 2008, filed August 5, 2008).

In June 2018, Employer advised Claimant that continuing leave would no longer be available because it was an undue hardship for Employer and that if Claimant did not return to work, Employer would not be able to retain him as an employee and would begin the termination process.  C.R. at 924-25, 1003-04.  As a result, Claimant returned to work on July 15, 2018.  Upon his return, Claimant did not work a 40-hour week, and there was no testimony from Claimant regarding his expectations.  *Id.* at 926.

Deputy Warden testified that the CBA established Claimant's hourly rate of $33.59 based on his seniority.  C.R. at 930-31.  After the injury, Employer offered Claimant modified work.  According to the offer letter, Employer expected Claimant to return to work for the 7:00 a.m. to 3:00 p.m. shift, five days a week, with "pass days [to] remain Tuesday/Wednesday" at the pay rate of $33.59.  *Id.* at 895, 930-31, 1005.  Although the offer letter pertained to the modified position, it supports the expectation that Claimant's schedule would "remain" the same as it was prior to the injury and provides for a prospective calculation of potential earnings.  *See* C.R. at 895.  This equates to an AWW of $1,343.60 with a corresponding

---

[10] Claimant worked seven days total from August 20, 2017, through September 22, 2017. When he returned to work before the injury, he worked on July 15, 2018, July 21, 2018, and July 27, 2018, when he was injured.  C.R. at 926.

compensation rate of $895.64.  *See* 77 P.S. §582(d.2).  To conclude otherwise and base Claimant's AWW on the period in which he took Employer-approved FMLA leave and worked approximately 10 days would grossly underestimate Claimant's true earning capacity and would penalize Claimant for taking Employer-approved FMLA leave.  *See Colpetzer*; *Hannaberry*.  Upon review, the WCJ's finding that Claimant had a reasonable expectation of earning an AWW of $1,343.60 with a corresponding compensation rate of $895.64 per week is supported by substantial evidence and in accord with the humanitarian purposes of the Act.

## IV. Conclusion

Accordingly, we affirm the order of the Board.

_____

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Allegheny,          :
                                 :
           Petitioner   :
                                 :
          v.             : No. 1111 C.D. 2022
                                 :
Michael Marzano (Workers'   :
Compensation Appeal Board),   :
                                 :
          Respondent :

# **O R D E R**

AND NOW, this 24th day of December, 2024, the order of the Workers' Compensation Appeal Board, dated September 15, 2022, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge